Anngela COOPER, Plaintiff,

v.

WYETH AYERST LEDERLE, International Chemical Workers Union Local 143C, and Richard Dumas, Defendants.

No. 98 Civ. 1865 (CM).

United States District Court, S.D. New York.

June 9, 2000.

Kim E. Greene, Deiley, Dautel & Mooney, LLP, Albany, NY, for Plaintiff.

David R. Jewell, Orrick, Herrington & Sutcliffe, LLP, New York City, for Defendant AHP.

Robert Lowrey, Randall Vehar, General Counsel, Intern. Chemical Workers Union Council, Akron, OH, Patricia McConnell, Meyer, Suozzi, English & Klein, P.C., Mineola, NY, for Defendant Local 143.

Eugene Zinbarg, New York City, for Defendant Dumas.

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DISMISSING THE CASE

McMAHON, District Judge.

Plaintiff Anngela Cooper brings sex discrimination and sexual harassment claims under Title VII, 42 U.S.C. § 2000e, *et seq.*, against her former employer, Defendant American Home Products Corporation ("AHP")(sued here as Wyeth Ayerst Laboratories)[1] and her former union, Defendant International Chemical Workers Union Local 143C ("Union") and a state law sexual harassment claim against her former supervisor, Defendant Richard Dumas. She also joins a state law employment claim against AHP.

Both the Defendant employer American Home Products, which has been charged with failure to protect Plaintiff against sexual harassment by her supervisor, and the Defendant Union, which has been charged with discriminatory breach of its duty of fair representation, have moved for summary judgment.

For the reasons stated below, AHP's motion is granted and all federal claims against it are dismissed. The Union's motion to dismiss Plaintiff's claim for discriminatory failure to carry out its duty of fair representation is also granted. The Court declines to exercise supplemental jurisdiction over Cooper's remaining state law claims against AHP and Dumas.

---

**1.** American Home Products has been sued as Wyeth Ayerst Lederle. The Court *sua sponte* deems the caption amended to substitute the name American Home Products for Wyeth Ayerst Lederle, and the Defendant employer will be referred to as American Home Products, or AHP, hereafter.

## I. STATEMENT OF FACTS

Viewed most favorably to Plaintiff, the non-moving party, the facts are as follows:

Plaintiff is an African–American woman who began working at Wyeth Ayerst Lederle (the predecessor in interest to and currently a subsidiary of AHP) in Pearl River, New York in 1977.[2] Defendant Union Local 143C served as representative for all bargaining unit employees. Plaintiff had been a member of Local 143C from 1977–1988 and rejoined in March 1996. (Def. Union's 56.1 Stmt.) The Union operated pursuant to a Collective Bargaining Agreement ("CBA") with AHP.

Plaintiff joined the Liquids and Ointments Department ("L & O" or "Department 260"), on or about November 14, 1990, as an Operator I on Shift C, a night shift. (Pl. Admissions ¶ 5.) At that time, Richard Dumas worked on the same shift as an Operator II, a non-supervisory position. (O'Brien Aff. ¶ 22.) On or about May 18, 1992, Dumas transferred from Shift C to Shift B, a day shift, and he and Plaintiff did not work the same shift for three years, until April 1995. (Pl. Admissions ¶¶ 6–8.)

On or about April 10, 1995, Plaintiff transferred to Shift B and was again on shift with Dumas, who at that time held the position of Senior Operator, L & O. (Pl. Admissions ¶ 18–19; O'Brien Aff. Ex. C.) While AHP characterizes this as a non-supervisory position, in that Dumas has no hire-fire-promote-demote-discipline power, it is undisputed that a Senior Operator, L & O, directed the work of Operators I and II. (O'Brien Aff. ¶ 30.) On or about June 19, 1995, Dumas temporarily assumed the duties of Supervisor, L & O, and seven months later he was formally promoted to that position. (Pl. Admissions ¶ 21.) Plaintiff was promoted to the position vacated by Dumas in February 1996. (Pl. Admissions ¶ 29.) Dumas made the promotional recommendation. (Gibberman Dep. at 21, 116.)

Sometime during the period when Plaintiff and Dumas were not working the same shift, they began a sexual relationship. At various times, Plaintiff or her counsel have alleged that the relationship began as early as March 1993, i.e. three years prior to March 1996 (Minter Letter of June 20, 1996) or as late as February 1995. ( Tr. of Cooper's Test. before Workers' Comp. Bd., Mar. 26, 1998 at 15, attached to O'Brien Aff. at Ex. P.) Plaintiff has also characterized, or caused her counsel to characterize, the relationship in diametrically opposing ways: as both consensual (Minter Letter, *supra.*) and coerced, (Letter of Bert Pepper, MD, attached to Cooper Aff. at Exh C).[3] While this changeability bears on Plaintiff's credibility, it is not relevant for purposes of this motion. Whenever and however it started, it appears that Plaintiff stopped having sex with Dumas in or about March 1996, almost immediately after he promoted her into his old job. It is the post-sexual relationship behavior that is at issue in this suit.

Dumas thereafter began harassing Plaintiff, by bumping his body into hers, calling her names, demanding sex from her, depriving her of overtime activities, assigning her to menial tasks and threatening to have her fired. (Cooper Aff. ¶¶ 26–28.) Commencing in April 1996, approximately one month after the harassment began, Plaintiff complained to at least five Union shop stewards about Dumas. (Cooper Aff. ¶¶ 29, 32, 52, 54.) Her complaints included claims that Dumas

---

2. For a brief period between 1979 and 1980, Cooper left the Pearl River facility to serve in the U.S. Army. (Def. Union's 56.1 Stmt.) She returned to the facility in November 1980. (O'Brien Aff. at 4.)

3. Dumas has also been inconsistent in his recollection of the relationship. In papers before this Court he states that he had a "brief intimate relationship" with Cooper and that he ended the relationship. (Dumas Aff. at ¶ 5.) Before the Worker's Comp Board he stated that he had sex, but not relationship, with Cooper. Earlier, in conversations with Joanne Rose, he denied ever having a relationship with her. (Gibberman Dep. at 86.)

was assigning her and others in her work area menial tasks, that she was not being fairly awarded overtime hours and that Dumas was showing her disrespect. On at least one occasion, Plaintiff told shop steward Michael Youhas that Dumas was "talking dirty" to her, although she never told Youhas what words Dumas used. (Youhas Dep. at 73.) Youhas asked Dumas whether he was harassing Plaintiff, asked if any of her co-workers could corroborate her story, and walked into the department several times in order to try to catch Dumas "in the act." Everyone denied Cooper's allegations. Unable to corroborate Plaintiff's story, Youhas did not file a grievance and referred Plaintiff to AHP's EEO personnel. (Youhas Dep. at 59, 84–85, 110.) It is undisputed that Cooper did not tell Youhas anything about her sexual history with Dumas.

On May 24, 1996, following what she deemed a particularly egregious incident of physical contact, Plaintiff went to Joanne Descher–Rose, the Human Resources Manager at the facility, and complained that Dumas was "harassing" and "disrespecting" her. (Descher–Rose Dep. at 27–9.) Cooper did not mention her prior sexual relationship with Dumas or give Descher–Rose any information that would have placed her complaint in the "sexual harassment" context. Descher–Rose recorded in her notes that Plaintiff had raised a Union, not an EEO, issue. (Descher–Rose Dep. at 115; PX 98.) Descher–Rose nevertheless spoke to both Dumas and his supervisor, Gary Muscarella, about Plaintiff's complaints of unfair treatment in work assignments. Dumas and Muscarella told her that Plaintiff was experiencing serious performance problems. (Descher–Rose Dep. at 59–60.)

Plaintiff obtained medical leave from the plant nurse immediately after her interview with Descher–Rose. When she returned to work on June 3, bearing a doctor's note that established treatment for stress and anxiety, Plaintiff met with Descher–Rose once again. Descher–Rose told Cooper that she was having performance problems and suggested that further complaints should be handled through the Union. (Descher–Rose Dep. at 60.) Again, Plaintiff did not enlighten Descher–Rose about the matters that would have alerted Descher–Rose to the sexual aspect of the situation. Instead, she became upset and asked for another disability leave. Descher–Rose refused to grant her request and sent her back to work, under Dumas' supervision. (Descher–Rose Dep. at 61.)

No sooner had Plaintiff arrived back at work than Dumas presented her with a disciplinary Interview Record, in which he alleged that Cooper had committed six serious violations of company rules during the week of May 21. Shop steward Youhas represented Plaintiff when Dumas presented the Interview Record to her. Youhas was concerned that the Interview Record had been given in retaliation for Plaintiff's prior complaints about Dumas, but he took no action other than to ask Dumas if he was retaliating—which Dumas of course denied. (Youhas Dep. at 107.)

At Cooper's request, the Union filed a grievance on her behalf concerning the Interview Record. Despite Youhas' prior investigation into "sexual harassment," and his concerns about retaliation, the grievance referred neither to sexual harassment nor to retaliation. Cooper, stressed, went again to the company nurse, who again placed her on medical leave and assisted Plaintiff in drafting a letter to report the harassment to AHP. (Burke Dep. at 38–9; Cooper Dep. at 28–52.) Plaintiff revised the letter Burke drafted for her, typed it and mailed it on June 11 to Stephen White, the Plant Manager, with copies to Charles Hildenbrand, Director of Consumer Health Products, Joanne Descher–Rose, and Robert Glover, President of the Local Union. The letter stated as follows:

I, Anngela Cooper, am a Senior Operator in department # 620. My immediate supervisor is Richard Dumas.

The purpose of this letter is to advise management of a situation I'm confronted with an a daily basis. I have been consistently harassed for the past 6 to 7 weeks. Due to this its [sic] been difficult to maintain my normally high productivity at work. It has been a constant interference, also creating problems in my personal life.

I brought this to the attention of C. Hildenbrand Director of Consumer Health Products, J. Descher Rose—Human Resources and Robert Glover—Union president, verbally. To this date, it is still unresolved. Because of emotional, mental and physical harassment, I feel intimidated at this time I'm scared [sic].

At this point I'd like to resume my normal activities at work without feeling threaten [sic]. I'm hoping you can address this matter immediately.

(Cooper Letter, June 11, 1996, O'Brien Aff. at Ex. F.)

Although the letter obviously contained allegations of serious and disturbing harassment, it again failed to mention the key background facts: a prior sexual relationship that had ended and subsequent requests for sexual favors that were rejected.

However, while on medical leave, Cooper also hired a lawyer, Rachel Minter, who provided the missing piece of the puzzle. In a letter to Plant Manager White dated June 20, 1996, Minter alleged that her client had been subjected to "qui pro quo sexual harassment (i.e., retaliation for withholding sexual favors)" by Dumas. She further stated:

Ms. Cooper alleges that her immediate supervisor, Richard Dumas, issued the disciplinary notice without just cause and withdrew overtime in retaliation for (1) her unilateral termination, in or about March of this year, of a three-year

romantic relationship over Dumas' objections; and (2) her complaint, on or about April 29, 1996, that Dumas had given inappropriate directives to employees regarding a contaminated product. . . .

(Minter Letter, June 20, 1996, O'Brien Aff. at Ex. G.)

There is no evidence in this record that AHP management (as opposed to the Union) had any specific information about the sexual nature of the harassment prior to the sending of Ms. Minter's letter.

Plaintiff was cleared by her physician to return to work, without restrictions, on June 23. She returned to work on June 24. AHP ordered Dumas to have another employee present whenever he gave Plaintiff an assignment, and Dumas complied with that directive. (Cooper Dep. at 282–23.) However, Plaintiff perceived that Dumas was still harassing her (Cooper Dep. at 282–86), and she again reported to the plant nurse, who sent her to Clifford Gibberman, AHP's Director of Labor Relations, for assistance, (Cooper Dep. at 294–95).

Gibberman testified that he suggested that Plaintiff transfer out of Department 620, although he did not specify any position that Plaintiff might take. Although he had read Minter's letter, Gibberman continued to insist that Cooper's problems related to performance, not harassment. (Gibberman Dep. at 60–68.) Gibberman inquired about any prior relationship between Plaintiff and Dumas, and learned that there had been a sexual relationship (although Dumas initially denied it). He also learned that a former supervisor had been aware of this relationship when he recommended Dumas for promotion.[4] Nonetheless, Gibberman deferred any investigation into Plaintiff's sexual harass-

4. Dumas was formally promoted in or about February 1996; he received the title "acting supervisor" in July 1995. The record does not indicate whether the former supervisor was aware of the sexual relationship between Dumas and Cooper in July 1995, or not until February 1996.

ment allegations to Descher–Rose. (Gibberman Dep. at 81, 85–87.)

Plaintiff's Step 1 grievance meeting was held on June 27, 1996. Plaintiff was represented by Shop Steward Michael Rambin; Muscarella and Dumas attended for the company. The meeting was truncated before all six of Plaintiff's alleged rules violations had been discussed, and Muscarella denied the grievance at the first level. (Muscarella Dep. at 150–53.) However, Muscarella told Rambin that the company had offered to tear up the Interview Record if Plaintiff would bid out of Department 620 and urged her to do so. (Cooper Aff. ¶ 62.) Plaintiff refused, saying that she had done nothing wrong and ought not be penalized. Rambin then directed her to return to work under Dumas' supervision. (Id. ¶ 63.) Instead, Plaintiff went to the one place where her complaints had been heard—Nurse Burke—and was immediately sent home on medical suspension. She did not return to work at the Pearl River facility again. (Cooper Aff. ¶¶ 60–63; Burke Dep. at 50 and Ex. 3.) Therefore, Dumas could not have committed any acts of sexual harassment toward Plaintiff after June 27, 1996. (Pl. Admissions ¶ 88.)

Plaintiff, now acting primarily through her lawyers, pursued her grievances against AHP. In early August 1996, Arthur J. Corrado, Esq., Director and Counsel Labor Relations Department of the Wyeth–Ayerst Division of AHP responded to Minter's June 20 letter. (O'Brien Aff. Ex. I.) Corrado indicated that an internal investigation had failed to substantiate Plaintiff's allegations of retaliation and unwarranted discipline. However, Corrado advised Minter that AHP would permit Plaintiff to invoke certain medical "bumping rights" under the Union contract, which would enable her to transfer to "a more satisfactory position" upon her return from medical leave. He did not specify any position for which she would be eligible (O'Brien Aff. Ex. I), Neither Cooper nor her attorney made any inquiry as to what positions would be available.

However, at some point, Union President Glover and Labor Relations Officer Gibberman had a conversation about Plaintiff's job options. The two parties to that conversation sharply dispute what was said. Glover testified that Gibberman informed him that only two positions would be available to Cooper, both of which would result in a demotion; Gibberman claims to have said nothing of the sort and avers that Plaintiff could have transferred to any position for which she was qualified and had sufficient plant-wide seniority, even if the position was not vacant. (Gibberman Dep. at 97–100; Glover Dep. at 98–103.) Glover testified that he relayed Gibberman's proposal of allowing Cooper to invoke medical bumping rights—at or above her current pay rate—to Attorney Minter. (Glover Dep. at 99.) Neither man thought about whether any position would require Cooper to come back into contact with Dumas, which she greatly feared, and which her doctor indicated would be medically harmful to her. (Glover Dep. 102; Gibberman Dep. 102.)

Cooper also wished to pursue her Union grievance. She retained new counsel, who wrote to Gibberman to ask that the attorney be allowed to accompany her client to the Union grievance meeting and that Dumas be excluded. (Greene letter to Gibberman, Dec. 9, 1996.) Gibberman, an AHP management employee, refused to allow Plaintiff's attorney to attend the grievance meeting. He informed the attorney that if Cooper failed to participate in the grievance process as outlined in the Collective Bargaining Agreement, AHP would assume that it had been withdrawn with prejudice. (Gibberman Dep. Ex. 64–65.) Gibberman did not directly address the request to exclude Dumas from the grievance. However, AHP has a policy of permitting an accused employee to attend a sexual harassment grievance hearing and to confront his accusers. (Gibberman Dep. at 105).

Attorney Greene wrote Gibberman again on January 2, 1997, reiterating that

Plaintiff could not be in Dumas' presence. (Gibberman Dep. Ex. 66.) In a letter dated January 20, Gibberman again declined to address whether Dumas would be allowed to attend the grievance meeting. (Gibberman Dep. Ex. 67.) However, he indicated that the grievance could proceed without the Plaintiff being present. (*Id.*) Plaintiff did not acknowledge this possibility. The Step 2 hearing was never held.

Attorney Greene also responded to Corrado's August letter. On December 13, 1996, Attorney Greene advised Corrado in writing of the risk facing her client if she had to confront Dumas. Greene also wrote, "[T]he company has failed to take any action whatsoever to address the situation," despite knowledge of Cooper's complaints. (O'Brien Aff. Ex. J.) Greene rejected the transfer offer on behalf of her client, saying that, based on her discussions with Glover, it would constitute a demotion and would inappropriately punish Cooper rather than her harasser. (*Id.*) Corrado did not respond.

On January 23, 1997, Attorney Greene wrote Corrado a letter in which she alleged that the company's failure to take any meaningful steps to redress Plaintiff's complaints meant that she had been "constructively discharged." (O'Brien Aff. Ex. K) Plaintiff herself never wrote a letter of resignation. She would later testify that she herself did not resign and did not feel compelled to do so (Cooper Dep. at 311–14), statements that Defendants find highly significant, but that are in fact both highly ambiguous and virtually meaningless, in light of Plaintiff's contention that she was "discharged" and her lawyer's January 23 letter to Corrado so stating.

On January 31, Corrado responded to Attorney Greene's last letter, reiterating AHP's belief that Cooper's allegations could not be substantiated but again offering her "bumping rights" to an unspecified position. The letter concluded, "Please have Ms. Cooper directly contact her Human Resources Department to arrange for the retrieval of her personal belongings and surrendering any company property in her possession." (O'Brien Aff. Ex. M.) Other than making this indirect acknowledgment that Plaintiff did not plan to return to work, Corrado never responded to Cooper's contention that she had been constructively discharged. (*Id.*)

The next day, on February 1, 1997, Dumas was disabled in an automobile accident. His employment with AHP ended six months later, pursuant to a company policy that required the termination of any non-Union employee who did not return to work after six months' medical disability leave. (O'Brien Aff. ¶¶ 51–52.) Kenneth O'Brien, AHP's Senior Director and Counsel for Labor and Employment, advised Attorney Greene that Dumas had been terminated and offered to restore Plaintiff to her former position without regard to her claims against AHP. (Pl. Admissions ¶ 116.) Plaintiff elected not to return, ostensibly because AHP would not commit never to rehire Dumas. She was formally terminated after thirty months of medical disability leave, on December 28, 1998, again pursuant to company policy and the CBA. (O'Brien Aff. ¶¶ 54–55 and Ex. L and O.)

On June 19, 1997, Plaintiff filed a charge of discrimination with the EEOC. This was within 180 days of her alleged constructive discharge by AHP, but nearly a year after her last day at work and the last possible act of sexual harassment by Dumas. Cooper named both AHP and Local 143 as respondents in her charge. She alleged race discrimination, sex discrimination and retaliation. She particularized her charges as follows: constructive discharge due to quid pro quo and hostile environment sexual harassment, race and sex discrimination and retaliation. She alleged that she was subjected to physical and verbal abuse and threats by her supervisor, that she was subjected to unwarranted disciplinary action when she complained, that she was forced into a disability leave as a result, that neither the company nor the union took any action to resolve the situation and

that Plaintiff had been given the choice to either accept a demotion or return to work under Dumas. The last discriminatory act was alleged to have taken place on January 31, 1997. The EEOC issued a right to sue letter with respect to the charge on January 13, 1998. The right to sue letter listed only AHP as Respondent, although the charge on its face had named the Union as well.

## II. PROCEDURAL HISTORY

This action was commenced on March 16, 1998. An Amended Complaint was filed on April 22, 1998. All three Defendants moved under Rule 12(b)(6) to dismiss the Amended Complaint; the Union moved in the alternative for summary judgment. The Hon. Barrington D. Parker granted the motions in part and denied them in part: he dismissed Plaintiff's claims of race discrimination under §§ 1981 and 1985 without leave to replead; he denied the motions to dismiss on the basis that the charge was never filed with the New York State Division of Human Rights, so that the 300 day statute of limitations was inapplicable; he granted the Union's motion to dismiss all claims asserted against it under state law, on the authority of *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988); and he otherwise denied the Union's motion for summary judgment on the ground that there were disputed issues of fact concerning a number of material issues. *See Cooper v. Wyeth Ayerst Lederle, et al.*, 34 F.Supp.2d 197 (S.D.N.Y.1999). Following a period of protracted and contentious discovery, all three Defendants have moved for summary judgment.

## III. AHP'S MOTION FOR SUMMARY JUDGMENT

### A. *Standard*

It is well established that summary judgment is appropriate where the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, the court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, to defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). For a Plaintiff in a discrimination case to survive a motion for summary judgment, he or she must offer "concrete particulars" to substantiate the claim. *See Meiri v. Dacon*, 759 F.2d 989 (2d Cir.1985) *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

### B. *AHP's Motion to Dismiss Federal Causes of Action*

There remain three claims against AHP sounding in Federal law: (1) sexual harassment and ratification of harassment under Title VII (First Cause of Action), 42 U.S.C. § 2000e *et seq.;* (2) retaliation under Title VII (Eighth Causes of Action), 42 U.S.C. § 2000e–3(a); and (3) constructive discharge under Title VII (Tenth Cause of Action). 42 U.S.C. § 2000e–2(a)(1). Plaintiff has also asserted a claim for prevailing party attorney's fees under 42 U.S.C. § 2000e–5(k) (Twelfth Cause of Action).

#### 1. *Sexual Harassment Claim Barred as Untimely*

AHP, acknowledging that there are factual disputes concerning Plaintiff's contention that she was sexually harassed, moves for summary judgment on the ground that Plaintiff's EEOC charge was untimely. It is undisputed that the last discrete act of

sexual harassment directed toward Plaintiff took place more than 300 days prior to the filing of Plaintiff's charge. Nonetheless, Plaintiff contends that her charge is timely, either because the date of the last act of discrimination was the date that she deemed herself constructively discharged (which, for purposes of this motion, the Court will fix at January 23, 1997, the date of Attorney Greene's last letter), or because AHP's seven month long refusal to offer her adequate redress for her claims amounted to a continuing violation that extended into the timely period for filing a charge.

Title VII requires that a claimant file a charge of discrimination with the EEOC within 180 days of an alleged unlawful employment action, or within 300 days if the claimant files in a work-sharing State. See 42 U.S.C. § 2000e–5. Because this requirement is treated as a statute of limitations, failure to file a timely EEOC charge will result in the dismissal of an action brought on the same claim. See Butts v. City of New York Dept. of Housing Preservation and Development, 990 F.2d 1397, 1401 (2d Cir.1993). Judge Parker previously determined that the 300 day period is the applicable limitations period in this case, because there was a Work–Sharing Agreement between the EEOC and the New York State Department of Human Rights New York in place at the time Plaintiff filed her charges with the EEOC. See Cooper v. Wyeth Ayerst, 34 F.Supp.2d 197, 200 (S.D.N.Y.1999). Therefore, all acts of discrimination that occurred prior to 300 days before Plaintiff filed her charge are time-barred (unless they are revived under the so-called continuing violation theory). And if all acts of discrimination occurred prior to 300 days before Plaintiff filed her charge, then AHP is entitled to summary judgment.

There is no question that Plaintiff failed to file her charge within 300 days of the last possible act of sexual harassment by Dumas, which is June 27, 1996. Three hundred days prior to June 19, 1997 is August 24, 1996. By that point, Plaintiff was out on medical leave, so no further acts of harassment could take place.

To overcome the time bar, Plaintiff attempts to transform her complaint into a continuing violation. She charges, in essence, that AHP did nothing, or at least not enough, to redress her sexual harassment complaint during the 300 day period—and, indeed, prior to that period, going back to the spring of 1996, when AHP (whether through her rather vague May complaint to Descher–Rose and/or her somewhat more specific June letters to White) first became aware of Plaintiff's complaints. Plaintiff argues that AHP's inaction in the face of her serious complaint—its desultory investigation, its refusal to allow her to grieve her charge without Dumas' (the accused) being present, and its insistence that she, rather than Dumas, accept a transfer (one that she believed would result in a demotion)— constituted ongoing and continuous discrimination against her in violation of Title VII. In other words, Plaintiff argues that employer inaction in the face of a complaint transforms an otherwise discrete act of discrimination into a continuing violation, because the employer's inaction was a continuation of her supervisor Dumas' discriminatory conduct. And, if the discrimination was a continuing violation, the statute of limitations does not begin to run until the last discriminatory act in completed. See Gomes v. Avco Corp., 964 F.2d 1330, 1333 (2d Cir.1992).

AHP responds that Title VII prohibits actions, not inaction, and that Plaintiff ought not be allowed to revive an untimely complaint simply by alleging that her employer did not address her complaints in a sufficiently thorough or satisfactory way. AHP further argues that a continuing violation cannot be made out by alleging that the effects of the harassment and the harassment itself were part of one continuous policy.

I reject Plaintiff's creative attempt to extend the continuing violation doctrine,

and I find her Title VII sexual harassment complaint to be time barred.

■ The Second Circuit has limited the application of the continuing violation doctrine to cases where there is (1) proof of a specific ongoing discriminatory policy or practice (such as discriminatory seniority lists or employment tests), or (2) where specific and related instances of discrimination are permitted by an employer to continue unremedied for so long as to amount to a discriminatory policy or practice. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir.1996); *Cornwell v. Robinson,* 23 F.3d 694, 703–704 (2d Cir.1994). AHP is thus wrong in asserting that an employer's inaction could never result in liability; where inaction amounts to an ongoing policy of discrimination, an employer could be found liable under a continuing violation theory. However, discrete discriminatory acts—or discrete instances of discriminatory inaction—not related to a discriminatory policy are not a continuing violation. *See Lambert v. Genesee Hospital,* 10 F.3d 46, 53 (2d Cir.1993)(citing *Stoller v. Marsh,* 682 F.2d 971, 975 (D.C.Cir.1982)). *Cornwell* itself demonstrated an appropriate application of the continuing violations doctrine. There, discrimination continued unremedied for a period of years after the employer was put on notice of the first instances of harassment. Incidents of harassment ceased for a period of time, largely because the employee was on sick leave as a result of the incidents. But the harassment started anew when the Plaintiff returned to work and did not end until the day Cornwell was finally driven from the workplace. *Cornwell,* 23 F.3d at 704. The Second Circuit held that these facts made out a continuing hostile work environment, as well as an ongoing policy of harassment that constituted a continuing wrong. The statute of limitations was thus held to begin to run on the date the harassment finally ended, which was the date Cornwell left her job.

In her brief, Cooper argues that the date of her constructive discharge (see discussion below) is the date of the last discriminatory act for the purpose of a continuing violation. The holding of *Cornwell* makes clear, however, that a continuing violation encompasses not the effects of the harassment, but only the underlying acts themselves. Thus, under *Cornwell,* the last date that Plaintiff experienced any sexual harassment must be deemed the last date any discriminatory act could have taken place for the purposes of establishing a continuing violation. And that day was her last day on the job—June 27, 1996.[5]

■ It is undisputed that Cooper made her first complaints—to the Union—in April 1996; her first complaint to AHP (albeit without any mention of sex) in May; and her first specific complaint to the employer about sexual harassment in mid-June. The last possible act of sexual harassment or retaliation occurred on or prior to June 27, which was Cooper's last day on the job. Thus, applying the *Cornwell* analysis, Plaintiff at most makes out a claim that AHP engaged in a continuing violation of her rights under Title VII up to the day she left the job, June 27, 1996. There could be no continuing violation during the time Plaintiff was on sick leave, because she never returned to the workplace, so the harassment did not resume, as it did in *Cornwell.*

To the extent Plaintiff is suggesting that AHP's failure to conduct a sufficiently vigorous investigation, or to propose a remedy that she believed would be appropriate in the circumstances, represents a continuation of Dumas' harassment and retaliation, I reject the argument. Plaintiff's novel continuing violation argument has been made before, and rejected, in a

---

**5.** Cooper claims that she was constructively discharged much later than her last date at the workplace. (*See* section III.B.3, *infra.*)

lengthy and scholarly opinion by Judge Gertner of the District of Massachusetts. *See Ruffino v. State Street Bank and Trust Co.*, 908 F.Supp. 1019 (D.Mass.1995). In *Ruffino*, the plaintiff, like Cooper, left her job to take medical disability leave due to sexual harassment, and later informed her employer that her physician advised against her returning until the conditions that upset her were alleviated. Nonetheless, she did not allege any specific conduct during the limitations period that was sufficient to support her claim for hostile environment. Instead, she urged that the employer's failure to conduct more than a perfunctory investigation, or to remedy conditions that were causing her distress, contributed to the hostile environment in which she was compelled to work (or, more precisely, to which she felt she could not return).

Judge Gertner rejected Ruffino's efforts to revive her stale claims, because she had not alleged and could not allege that actionable harassment had continued as a result of the employer's inaction. She held that the sexual harassment of the plaintiff by Ruffino's supervisor effectively ended when she accepted a transfer to another position within the employer bank, and had not continued up to or beyond the limitations period. Further, the plaintiff was unable to identify any specific harassing behavior that occurred after her transfer. Ruffino was able to identify behavior that might qualify as retaliatory, but, as Judge Gertner noted, retaliation is a separate claim, even where—as in Ruffino's case (and Cooper's)—there is a factual and legal intersection between the underlying claims of harassment and the retaliation.

In rejecting the continuing violations theory, Judge Gertner distinguished *Maturo v. National Graphics, Inc.*, 722 F.Supp. 916 (D.Conn.1989), the case Cooper relies on to support her argument that AHP's inaction gave rise to a continuing violation. In *Maturo*, the harassment had continued into the limitations period as a result of the employer's failure to investi-

gate or to remedy ongoing race discrimination that the court concluded was not an "isolated slur" but rather a "campaign of harassment." *Ruffino*, 908 F.Supp. at 1040 (discussing *Maturo*). Indeed, the harassment escalated after the employer failed to respond, which ultimately made plaintiff's working conditions intolerable. Thus, the District Court in Connecticut found a continuing violation—a finding that is completely consistent with the Second Circuit's subsequently announced *Cornwell* doctrine, and not at all applicable to the facts before me.

I do not necessarily agree with AHP that the last act of retaliation in this record was the receipt of the Interview Record on June 3, 1996. However, to the extent Plaintiff is contending that AHP's refusal to let her grieve without Dumas' being present constitutes an act of retaliation, it cannot be used to resurrect her previous sexual harassment or retaliation claims, because it is a separate and discrete (albeit related) incident within the meaning of the *Cornwell* doctrine. Thus, I reject Plaintiff's suggestion that her sexual harassment claims, or indeed any of her claims grounded in actions that occurred prior to August 24, 1996, are timely under the continuing violation doctrine. This bars Plaintiff from pursuing redress under Title VII for her claim of sexual harassment in the workplace and for her claim for retaliation in connection with the issuance of the Interview Record, as all the acts underlying those two claims predate the 300–day limitations period.

2. *Allegations of Discrimination and Retaliation in the Grievance Process Fail*

Plaintiff contends that AHP discriminated and/or retaliated against her when it failed to respond to her request that she be allowed to grieve her Interview Record without Dumas' being present. Plaintiff contends that the manner in which AHP carried out the grievance process was itself a violation of Title VII. This claim is

not time barred because the grievance process at issue continued until after August 24, 1996. However, the claim is not supported by the evidence.

■ To make out a prima facie case of discrimination under Title VII, a plaintiff must show that she is (1) a member of the protected class, (2) qualified for and satisfactorily performing her job, (3) subjected to an adverse employment decision, and that (4) this adverse decision occurred under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994). Once the plaintiff has proven a prima facie case of discrimination, the burden shifts to the defendant to show a valid, non-discriminatory reason for its action. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). As AHP points out, Plaintiff has neither alleged that AHP's procedures for dealing with employee grievances are discriminatory nor offered so much as a scintilla of evidence from which a trier of fact could conclude that similarly situated males were treated differently from Cooper when their grievances were processed.[6] Therefore, to the extent that her claims about the grievance procedure sound in discrimination, I must grant summary judgment for the Defendants.

■ Plaintiff's contention that AHP's refusal to bar Dumas from the grievance hearing constitutes retaliation likewise fails. To make out a claim of retaliation under Title VII, an employee must show: (1) participation in a protected activity known to defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998).

The right to file and pursue a grievance is a protected activity within the meaning of Title VII and an employer's refusal to process a grievance is a recognized form of retaliation under § 704(a) of Title VII. *See* 42 U.S.C. § 2000e–3(a); *Johnson v. Palma*, 931 F.2d 203, 208 (2d Cir.1991)(holding that a union's refusal to process a grievance unless the employee withdrew his New York State DHR complaint made out a prima facie case of retaliation). A causal connection may be established "indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester County Medical Center*, 821 F.2d 111, 115 (2d Cir.) (citations omitted) *cert. denied*, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987). Once the plaintiff has made out a prima facie case of retaliation, the burden shifts to the defendant "to articulate a 'legitimate, nondiscriminatory reason' for its actions.' " *Taitt v. Chemical Bank*, 849 F.2d 775, 777 (2d Cir.1988) (citations omitted).

■ As regards the Step 1 grievance, I find no evidence of animus or discriminatory treatment. Cooper argues that the manner in which the proceeding was carried out is itself evidence of AHP's animus, but the facts do not support this assertion. Attorney Minter requested that a grievance be filed in response to the issuing of the Interview Letter. (Minter Letter to Glover, June 20, 1996.) In the written grievance, Cooper requested that the Interview Record be removed and that Cooper be "made whole." In her own averment to this Court, Plaintiff notes that she went to the Step 1 grievance meeting on June 27, 1996, at which Dumas was present. (Cooper Aff. ¶ 60.) According to her account, the meeting ended after fifteen

---

**6.** Because Plaintiff's race-based claims were dismissed by Judge Parker, I limit my discussion to her gender discrimination claims.

However, the record contains no evidence of preferred treatment of Caucasians, either.

minutes at the initiative of Muscarella. There is no evidence whatever that Dumas' presence at that meeting was irregular or that it constituted discriminatory treatment (i.e. that a male grievant would have been able to proceed without the accused being present). Nor is there any evidence that Plaintiff herself was adversely affected by his presence. Rather, the evidence put forth by Plaintiff is that she became upset at the meeting because she was dissatisfied with the remedy offered her at that time, which was to "bid out of the department." (*Id.*) [7] That Plaintiff was dissatisfied with the *results* of the Step I grievance process is simply not evidence that it was carried out in a *manner* that was discriminatory or retaliatory.

After Cooper hired Attorney Greene, she sought to pursue the grievance to Step 2. In her first letter to Gibberman concerning the grievance, Greene indicated that Cooper's doctors had advised her that she could not confront Dumas. (Greene Letter to Gibberman, Dec. 9, 1996 attached to Greene Aff. Ex. C.) The letter also included Greene's request that she, as Cooper's attorney, would be permitted to attend the grievance.

In response to Greene's request to be present, Gibberman wrote:

[I]t is the position of the Company that Mr. Glover President of Local 143c UFCW is the legal and appropriate representative according to our collective bargaining agreement. Mr. Glover has always represented the members of the Union in a competent and professional manner.

(Gibberman Letter to Greene, Dec. 20, 1996.)

Gibberman further stated that if Cooper did not participate in the grievance process as required under the CBA, AHP would assume that the grievance had been withdrawn. (*Id.*) He made no mention of whether Dumas would be present at the grievance. However, other evidence suggests that it was company policy to allow the accused to be present (Gibberman Dep. at 105), and drawing all inferences in the Plaintiff's favor, I will assume that AHP would have proceeded in accordance with its policy.

Greene's next letter made explicit that Cooper should be entitled to attend the grievance without Dumas' being present, and that Cooper "should not have to risk suffering additional emotional injury in order to preserve her rights." (Greene Letter to Gibberman, Jan. 2, 1997.) Greene further stated that she did not wish to supplant Glover at the hearing, but rather be present to advise her client.

Gibberman's response indicated that the Union would not allow Greene to be present, as the CBA "makes no provision whatsoever for either representation or participation in this process by any party other than the Union or the grievant." (Gibberman Letter to Greene, Jan. 20, 1997.) However, this time Gibberman noted that the grievance could proceed without Cooper's being present, and suggested that Cooper "meet with her Union representative to assist with their preparation of the grievance." (*Id.*) He made clear that without Cooper's participation, "It would be incumbent upon the Union to proceed without her as is contractually permissible." (*Id.*) Gibberman made perfectly clear in his last letter to Greene that Cooper could pursue her grievance, that she could meet with a Union representative at the off-site facility, and that the Union was free to involve Greene in any of its preparation for the grievance. (*Id.*)

---

**7.** Plaintiff also asserts that the fact that she was not given the written grievance until after the meeting constitutes evidence that she was treated differently from white males. (*Id.* at ¶ 84.) Of course, Rambin testified that he gave Cooper the written grievance during his meeting with her immediately prior to the hearing. However, assuming Plaintiff's version of the facts to be correct, Rambin testified that the reason he did not give Cooper the written grievance form until the day of the hearing was that Cooper was on sick leave, an undisputed fact. (Rambin Dep. at 80 attached to Vehar Aff. Ex. P–21.)

With respect to the issue of Dumas' presence, there is no evidence in the record to raise any inference that Cooper was treated any differently from male employees who had filed grievances, or that this decision was reached because she was asserting her rights. As noted above, AHP contends that Dumas' presence was a matter of a company policy that those accused of harassment be given the opportunity to hear their accusers. (Gibberman Dep. at 105.) In his deposition testimony, Gibberman allowed that, in theory, exceptions to the policy could be made. But the admitted fact that an exception was never considered in Cooper's case does not give rise to an inference of either discrimination or retaliation in the absence of evidence that other grievants (particularly males) received exceptions. (*Id.*) Gibberman's refusal even to address the issue of Dumas' presence in his letters to Greene is not, as Cooper contends, a denial of her rights to pursue the grievance. Cooper continued to maintain a right to pursue her grievance; she just did not have the right to set all the conditions for how that grievance would proceed.

Because Cooper still could have pursued her grievance, even without being present, then as a matter of law, Gibberman's refusal to exclude Dumas from the Step 2 grievance could not constitute retaliation.

### 3. *Constructive Discharge Claim*

Cooper's remaining federal claim is for constructive discharge (Tenth Cause of Action) under 42 U.S.C. § 2000e-2(a)(1). Plaintiff contends that, because of AHP's refusal to deal with her allegations in an appropriate way or to assure her of a harassment-free environment, she was constructively discharged, effective January 23, 1997, when Attorney Greene wrote Corrado to that effect. She notes that, where constructive discharge is claimed, the statute of limitations runs from the date when Plaintiff was constructively dis-

charged. *See Draper v. Coeur Rochester,* 147 F.3d 1104 (9th Cir.1998)("in constructive discharge cases periods of limitations begin to run on the date of resignation.") As her charge was filed within six months of her alleged constructive discharge, Cooper contends that all her claims are timely. Insofar as Plaintiff's constructive discharge claim is concerned, she is correct.

AHP offers several reasons why Plaintiff's allegations of constructive discharge do not get her past the time bar. First, they contend, Plaintiff never resigned from her position, which is the *sine qua non* of a constructive discharge claim. *See Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983). AHP acknowledges that Attorney Greene's January 23 letter mentioned constructive discharge, but claims that this letter was at most a threat to resign, as evidenced by the fact that Plaintiff testified that she did not resign between the commencement of her disability leave (in June 1996) and her receipt of her discharge letter from AHP (in December 1998). AHP also contends that Attorney Greene's letter cannot be deemed a resignation in that Plaintiff originally contended that she was constructively discharged when she received Corrado's letter on January 30, 1997.[8]

This is a silly argument. Plaintiff has indeed been inconsistent in her position concerning when she was constructively discharged. However, Attorney Greene's January 23 letter clearly states that Plaintiff considers herself to have been constructively discharged as of that date, and Corrado's January 31 response, in which he invites Plaintiff to arrange to pick up her personal property and turn in her company property, indicates that AHP viewed Plaintiff as having resigned. The fact that the "letter of resignation" was sent by an attorney rather than Plaintiff herself is of no moment.

---

**8.** I fail to see how Plaintiff's expert's damages calculation constitutes some sort of admission

by Plaintiff that she was terminated in June 1996.

Nor, I find, is the fact that Plaintiff testified that she did not "resign" during her medical leave persuasive. The question, directed to a lay witness who might well not understand the relationship between resignation and constructive discharge, does not squarely contradict the text of Attorney Greene's letter.[9]

Finally, AHP's self-serving behavior subsequent to the January 1997 correspondence, including its unilateral sending of a letter of termination in December 1998, does nothing to negate the legal effect of the earlier letters. Thus, I find that Plaintiff's claim of constructive discharge is not time barred.[10]

■ The question then becomes whether Plaintiff has offered some evidence from which a reasonable juror could conclude that AHP "deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir.1993). *See also Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir.1993)(constructive discharge requires showing work conditions "so intolerable that [the plaintiff] was forced into an involuntary resignation.")(quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983)). It is the Plaintiff's burden to demonstrate that she had no alternative to resignation. *See Pena* 702 F.2d at 325. I conclude that she has not offered any evidence from which a reasonable juror could conclude that her working conditions were in fact intolerable.

When Plaintiff resigned, she had been out of the workplace for more than seven months, and therefore could not have been experiencing intolerable working conditions. The only purportedly intolerable aspect of her situation was the prospect that she might have to come back to work under Dumas. But it is undisputed that AHP's offer to Plaintiff would not have required her to return to work under Dumas. AHP offered her the opportunity to transfer elsewhere in the plant.

The issue, therefore, is whether Plaintiff has offered any evidence from which a reasonable juror could find that the work conditions to which she would have returned would have been so intolerable as to compel her to resign. This, it seems turns on two questions: (1) would a transfer have involved a demotion; and (2) assuming arguendo that it did, would that fact alone be enough to make her post-transfer work environment intolerable under the standards applied in the Second Circuit?

AHP contends that its standing offer to Plaintiff to move into any position for which she was qualified and had adequate plant-wide seniority, without regard to whether the position was vacant at the time, indicates that Plaintiff was not required to return to work under Dumas. If

---

**9.** Cooper testified as follows:

 Q. Ms Cooper, when did your employment with Lederle end?
 A. I don't——
 Q. Let me rephrase that. You stopped working at Lederle on June 27, 1996; is that correct?
 A. Exactly.
 Q. And were you on medical leave for some period of time?
 A. Yes. Disability.
 Q. Did there then come a time the company terminated your employment with them?
 A. I think there is an agreement in the contract where it says if you stay out a certain time, I think, two and a half years, if you don't return, you are considered terminated.
 Q. Were you terminated on those grounds?
 A. Are you asking——
 Q. Did you receive anything from anybody?
 A. Yes.
 Q. Did you resign in the interim?
 A. No.
(Cooper Dep. at 318–19, attached to O'Brien Aff. at Exh. Q.)

**10.** Plaintiff seems to assume, *sub silentio*, that all her claims are timely if this claim is timely. Under *Cornwell*, I must disagree.

the evidence on this point were undisputed, AHP would be absolutely correct. Title VII does not convey upon an employee the absolute right to demand that a workplace dispute be resolved in a way that is most attractive to her. Title VII simply requires that the remedial action taken be reasonably calculated to end the sexual harassment. *See Snell v. Suffolk County*, 782 F.2d 1094, 1103–04 (2d Cir.1986)(applying reasonableness standard to employer's attempt to remedy racially hostile work environment). *See also Landgraf v. USI Film Prods.*, 968 F.2d 427, 429 (5th Cir.1992)(holding that although the harasser remained in the plaintiff's work area after the transfer, a "technical" transfer was sufficient remedial action.) And there is no requirement that the remedy include punishing the co-worker responsible for the sexual harassment. *Id.* at 430.

On this record, however, the facts concerning AHP's offer to Plaintiff are not clear. Indeed, there is a factual dispute between Gibberman and Glover concerning what was or was not said between them about her transfer situation. (And, of course, none of what Gibberman or Glover said was reduced to writing.) Glover testified that Gibberman told him that there were only two possible positions into which Cooper could transfer. One was a labor grade four, which Glover testified would have been a demotion for Plaintiff, since it was a lower-paying job. (Glover Dep. appended to Greene Aff. as Ex J at 98–103.) The second was a job as Pharmaceutical Operator, labor grade thirteen, which was one grade below Cooper's prior job as Senior Operator, grade fourteen. Glover testified that this job would have been at the same or a slightly lower hourly rate. Gibberman testified that his discussion with Glover on the transfer options was much more general and that no specific position was identified because Plaintiff never got back to him on the issue of transfer. (Gibberman Dep. at 101.) Gibberman and Glover both testified that they did not discuss whether Plaintiff would be required to have any contact with Dumas as a result of the transfer.

■ If this were all the Court had to go on, AHP's motion for summary judgment would have to be denied. However, AHP points out (and it is undisputed) that Plaintiff refused even to consider transfer as an alternative to resignation, and declined to explore what positions might be available with AHP. (AHP Reply Mem. at 4.) AHP further argues that Cooper's refusal precludes her from making a constructive discharge claim. I agree. An employee who fails to explore alternative avenues offered by her employer before concluding that resignation is the only option cannot make out a claim of constructive discharge. *See Gumbs v. Hall*, 51 F.Supp.2d 275, 282 (W.D.N.Y.1999)(employee not constructively discharged where she rejected employer's offer of a lower-ranking position). *See also Leson v. ARI of Connecticut, Inc.*, 51 F.Supp.2d 135 (D.Conn.1999); *Clowes v. Allegheny Valley Hospital*, 991 F.2d 1159, 1161 (3d Cir.), *cert. denied*, 510 U.S. 964, 114 S.Ct. 441, 126 L.Ed.2d 374 (1993); *Garner v. Wal–Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987).

■ The state of the record is as follows: Arthur Corrado wrote to Plaintiff's attorney, Rachel Minter, on August 2, 1996, and offered to allow Plaintiff to exercise medical "bumping rights" to move to a different position. Corrado did not indicate what positions were available, but he advised her that the medical opinion she submitted was "sufficient to invoke bumping rights to another position under our established procedures," a move which would "enable Ms. Cooper to transfer to a more satisfactory position upon her return from medical leave." (Corrado Letter to Minter, Aug. 2, 1996, attached to O'Brien Aff. at Ex. I.) He urged Minter "to encourage [Cooper] to accept such a transfer as an amicable resolution of this matter." (*Id.*) However, neither Plaintiff nor her attorneys (Minter or, later, Greene) ever asked management to clarify what positions might be available to her under the

bumping procedure. (Greene Letter to Corrado, Dec. 13, 1996 attached to O'Brien Aff. at Ex. J.) Instead, Plaintiff, through her attorney, took the position that any offer of transfer was not an acceptable resolution, since Dumas, not Cooper, was the wrongdoer:

> In your letter to Ms. Minter of August 2, 1996 you offered Ms. Cooper the option of invoking the contractual bumping procedures to obtain another position at the Pearl River facility. However, *any such move would constitute a demotion* for Ms. Cooper and an additional act of retaliation against her for having complained about illegal and discriminatory conduct.... *[A]n appropriate response to this situation would be to transfer and otherwise punish the harasser, Mr. Dumas,* not Ms. Cooper, who is the victim of Mr. Dumas' and the company's illegal conduct. Consequently, we reject this option.

(*Id.*)(emphasis added)

There is no indication on this record that Plaintiff ever attempted to clarify what her options were with regard to a transfer.

Ms. Greene's conclusory statement that any transfer would constitute a "demotion" is incorrect, both as a matter of fact—based on Glover's testimony that at least one of the available jobs was at Cooper's pay rate—and as a matter of law. Although in some instances courts have found transfers that constitute a demotion may also constitute a constructive discharge, such a finding cannot be based upon the employee's subjective preference for one position over another. *See Gray v. York Newspapers, Inc.,* 957 F.2d 1070 (3d Cir.1992)(employee's subjective interpretation that continued employment would be uncomfortable and demeaning and would lead to demotion or termination in the future does not constitute a constructive discharge); *Jett v. Dallas Independent School Dist.,* 798 F.2d 748 (5th Cir.1986) (transfer from athletic director/head football coach to freshman football and track coach with significant loss of coaching re-sponsibilities was not so intolerable that a reasonable person would have felt compelled to resign). Rather, the proposed job must be of such a nature that a reasonable person would resign rather than accept one of the offered positions. *See Clowes,* 991 F.2d 1159 (a reasonable employee will usually explore alternative avenues thoroughly before concluding that resignation is the only option). Cooper's evidence here falls far short of satisfying that requirement.

While there is a dispute over what Glover and Gibberman said to each other at one point about Plaintiff's options, there is no dispute whatever that Plaintiff simply refused to consider the transfer option—or any option that, in her view, penalized her and did not penalize Dumas. Indeed, she did not even inquire to see if a transfer really would result in her demotion (i.e. require her to work at a lower hourly wage) or could be arranged laterally. Under the law in this Circuit, a transfer, while not Cooper's preferred method of handling the matter, would have been a "reasonable step" to remove the allegedly intolerable fact of working with Dumas (assuming, as I do for purposes of this motion, that working with Dumas was medically contraindicated and, hence, "intolerable"). *See Torres v. Pisano,* 116 F.3d 625, 638 (2d Cir.1997)(holding that the employer's remedial action is subject to a reasonableness standard, taking into account the facts of the case and the gravity of the harassment.) An acceptance of a transfer to another department would have placed her in an area and environment where none of the conditions or experiences she complained of would have been present. Thus, a reasonable person would have taken some steps to determine if, in her mind, the new position would be satisfactory and would place her outside the reach of Dumas' allegedly intolerable behavior. Cooper's subjective feelings that any transfer would demean and demote her simply do not qualify as intolerable working conditions.

The problem with Plaintiff's argument (and with the position she took vis-a-vis AHP on this point) is that there is a very real difference between claims of discrimination/retaliation and claims of constructive discharge where issues of transfer are concerned. *See Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426 (2d Cir.1999)(reversing grant of summary judgment on retaliatory harassment claim but affirming summary judgment on constructive discharge claim). Transferring a complaining employee rather than her harasser could be considered as evidence that the employer has failed or refused to correct discrimination in the workplace, or is engaging in retaliation. *See Richardson*, 180 F.3d at 444 (plaintiff made prima facie showing of retaliation where she was transferred to a position requiring contact with inmate population immediately after she filed EEOC charges); *de la Cruz v. New York City Human Resources Admin. Dept. of Social Services*, 82 F.3d 16, 21 (2d Cir.1996)(deeming transfer to comparable position with no change in pay but different job responsibilities to constitute adverse employment decision). But the only thing an employer must do to defeat a claim of constructive discharge is provide a working environment that is not "intolerable." *See Pena*, 702 F.2d at 325. This, as the Second Circuit has held repeatedly, is a very low threshold. Put conversely, a working environment can be far from perfect and yet will not be held to be intolerable. *See Martin v. Citibank*, 762 F.2d 212, 221 (2d Cir.1985)(citing cases). Be-

cause Plaintiff herself refused to explore the employer's proposed remedy for the situation she found intolerable, I must grant AHP's motion for summary judgment dismissing the Tenth Cause of Action.[11]

## C. State Claims Against AHP

Having dismissed all the federal claims against AHP, I decline to exercise jurisdiction over the state claims brought by Plaintiff.

## IV. DEFENDANT UNION'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's remaining claim against the Union alleges that, through its failure adequately to pursue her grievance, the Union breached its duty of fair representation and discriminated against her on the basis of sex in violation of Title VII. The Union moves for summary judgment based on two grounds: (1) that the Plaintiff failed to exhaust the Union's internal grievance and appeal procedures; (2) that union is not an employer and cannot be held liable for AHP's failure to prevent or remedy the discriminatory conduct of an employee; and (3) that even if the Union were liable under Title VII, Plaintiff's claim is time barred.

In response, Plaintiff argues (1) that her membership in the Union was a requirement of her employment and that she therefore did not voluntary assume the obligations of Union membership, including any obligations to exhaust grievance procedures, and (2) that the Union had an

---

11. The parties have not briefed what to this Court seems the most interesting issue of all: whether a person who is not working can claim that her work environment is so inhospitable as to require her to resign. Beginning on June 27, 1996, Plaintiff did not have a work environment. Cooper's claim is, in essence, that the work environment she anticipated encountering upon her return to AHP would be hostile, because she would have to either work for Dumas (which, accepting Plaintiff's version of the facts, was medically contraindicated) or accept a position which she considered a demotion.

It seems to this Court that there is a certain degree of speculativeness in such a claim. The Second Circuit has made it exceedingly difficult for a Plaintiff who is working in uncomfortable conditions to make out a constructive discharge claim. *See Pena*, 702 F.2d 322; *Richardson*, 180 F.3d 426; *Martin*, 762 F.2d 212. It is hard to see how a person who is not working at all, and who therefore is not experiencing any uncomfortable conditions, can succeed on this most disfavored of all causes of action. However, the dismissal of this claim on other ground means that this question can be deferred for another day.

affirmative duty under Title VII to prevent and redress discrimination.

## A. Duty of Fair Representation Claim

 It is well established that a union's breach of its duty of fair representation may render it liable under Title VII. *See Goodman v. Lukens Steel Co.*, 482 U.S. 656, 667–69, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987)(a union violates Title VII and § 1981 if it intentionally fails to assert discrimination grievances on behalf of plaintiff); *Morris v. Amalgamated Lithographers of America, Local One*, 994 F.Supp. 161, 169 (S.D.N.Y.1998) (citations omitted). An alleged breach of the duty of fair representation ("DFR") can be challenged before the National Labor Relations Board or in a separate lawsuit. Title VII provides a proper foundation for a DFR lawsuit in two situations: (1) where a plaintiff alleges that the union has failed to assist in the processing of a grievance grounded in an employer's underlying discrimination; and/or (2) where the underlying grievance does not involve actionable discrimination, but the union itself acted discriminatorily in failing to prosecute the grievance. *See* Barbara Lindemann & Paul Grossman, Employment Discrimination Law 881 (3d. Ed.1997); *Perugini v. Safeway Stores*, 935 F.2d 1083 (9th Cir.1991)(reversing district court's summary judgment in favor of union on grounds that plaintiff raised a triable issue of whether the union's failure to challenge employer's discriminatory pregnancy policy was a breach of DFR and whether the union itself acted discriminatorily toward plaintiff.) Plaintiff's claim here falls under

both of these two theories. She alleges both that the Union failed and refused to file a sexual harassment grievance on her behalf and that it acted discriminatorily in prosecuting the grievance she did file.

### 1. Duty to Exhaust Administrative Remedies

 Defendant Union first contends that Plaintiff lacks standing to maintain her claims because she failed to exhaust internal Union remedies for the alleged defalcations of her local leaders. This defense lacks merit.

The Union relies principally on the Third Circuit's recent decision in *Anjelino v. New York Times Co.*, 200 F.3d 73 (3d Cir.1999), which held that plaintiffs who brought claims against the union under Title VII, the Labor Management Relations Act ("LMRA") and the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA") were required to exhaust the internal administrative remedies before bringing suit in federal court. In affirming the district court's dismissal of the Title VII claim, the Third Circuit noted, without any analysis or citations to case law, that "the appellants' failure to exhaust internal administrative remedies negatively impacts their ability to prove the Union liable under Title VII...." *Anjelino*, 200 F.3d at 96. The only case law cited by the Third Circuit for the proposition that plaintiffs are required to exhaust internal union remedies before filing suit against the union involved the LMRA or LMRDA. None involved Title VII claims.[12]

---

12. The additional authority submitted by the Union, *Raiola v. Union Bank*, 47 F.Supp.2d 499 (S.D.N.Y.1999), *Hart v. Canadian Imperial Bank*, 43 F.Supp.2d 395 (S.D.N.Y.1999) involved the enforcement of employees' agreements with their employers to bring all employment disputes—including those arising under Title VII—to mandatory arbitration. There is no arbitration clause at issue here. The only other case cited by the Union in support of this proposition is *Seidner v. Delair, et al.*, 1990 WL 118698, 1990 U.S.App. Lexis

14240 (6th Cir.1990), an unpublished opinion of five paragraphs (similar to our Circuit's summary orders) that cannot be relied on as precedent. Nonetheless, I have read it, and there is no indication therein that the pro se Plaintiff who brought the Title VII complaint against his union ever filed a charge with the EEOC. Therefore, the fact that he also failed to exhaust his union's internal grievance procedure is of no moment—his claim was dismissed for failure to meet the statutory prerequisite to a Title VII claim.

Based on this short reference in *Anjelino,* and the large body of National Labor Relations Act ("NLRA"), LMRA and LMRDA cases that require internal exhaustion, the Union argues that the Cooper's claim against the Union should be dismissed because Cooper failed to pursue and/or appeal the internal union grievance, and instead sought a right-to-sue letter from the EEOC. I find this argument unpersuasive.

It is well settled that a Union member cannot sue on a standard fair representation claim brought under the NLRA, LMRA or LMRDA unless she first exhausts the Union's internal grievance procedure. *See* 29 U.S.C. § 411(a)(4); *Clayton v. International Union, United Auto. Aerospace & Agricultural Implement Workers of America,* 451 U.S. 679, 692, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981); *Maddalone v. Local 17, United Broth. of Carpenters and Joiners of America,* 152 F.3d 178 (2d Cir.1998)(plaintiff required to exhaust administrative remedies before bringing claim under LMRA). The exhaustion requirement can be excused only by futility. *Clayton,* 451 U.S. at 696, 101 S.Ct. 2088.

It is equally well settled, however, that Title VII creates an independent statutory right in favor of employees, including union members, and that a union member need not pursue any separate contractual or statutory remedies before resorting to Title VII. *See Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).[13] Plaintiff argues that requiring her to exhaust the Union's appeals process before bringing a Title VII claim against the Union impermissibly burdens her right to the separate statutory remedy under Title VII.

In *Donaldson v. Taylor Prod. Div.,* 620 F.2d 155, 158–59 (7th Cir.1980), the Seventh Circuit held that failure to exhaust internal union grievance procedures is no

defense to a breach of fair representation brought against a union under Title VII. The plaintiff in *Donaldson* brought a case of discriminatory discharge against his former employer for discriminatory discharge, and against his union for a breach of DFR based on the union's failure to pursue his grievance against the employer to the arbitration stage. He claimed that the union failed to represent him because of his race. After a trial, the district court granted dismissal of the claims against the union defendant, which plaintiff argued on appeal had been grounded on plaintiff's failure to exhaust internal union remedies. The Seventh Circuit noted that "there is no exhaustion requirement under either Title VII or § 1981." *Donaldson,* 620 F.2d at 158. (citing *Waters v. Wisconsin Steel Works of Intern. Harvester Co.,* 502 F.2d 1309 (7th Cir.1974) *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976)). The Seventh Circuit noted that the district court's reliance on the exhaustion requirement related to dismissal of any general claims of a duty of fair representation against the union, but not to the race discrimination claim. *Id.* The court went on to uphold the district court's dismissal on the ground that plaintiff had failed to make out a prima facie case of racial discrimination.

While the Second Circuit has yet to speak on this narrow question, I am persuaded by the Seventh Circuit's reasoning. It appears clear from the Supreme Court's holding in *Alexander,* as well as the plain language of Title VII § 411(a)(4), that a plaintiff bringing a breach of fair duty claim under Title VII is under no duty to exhaust internal procedures prior to bringing a Title VII claim. As the Seventh Circuit noted in *Donaldson,* in a case involving a general claim of breach of DFR,

> [T]he point of the exhaustion requirement is that a union should have a right to attempt to satisfy disgruntled mem-

---

13. Of course, *Alexander* involved a union member's Title VII claim against his employ-

er, not his union.

bers, and a court should know just what the union did or did not do with respect to the complaint before trying to decide if fair representation really was denied and what relief would be just in the circumstances.

*Id.* at 158 (citing *Baldini v. Local Union No. 1095*, 581 F.2d 145 (7th Cir.1978)). Where a plaintiff alleges that the union's behavior during the processing of the internal remedy was itself discriminatory, requiring her to continue to pursue what she alleges is a discriminatory process would not serve the purpose articulated by the *Donaldson* court. I therefore agree with Plaintiff that failure to exhaust the union appeal is not defense to her DFR claim under Title VII.

This ruling is unquestionably confusing. Indeed, the entire concept of permitting a union member to sue her Union for breach of the duty of fair representation (an LMRA concept) under Title VII is confusing, in that it makes what is essentially the same claim subject to two radically different statutory schemes, each with its own statute of limitations and exhaustion doctrine. However, Congress in its wisdom has decreed that it shall be thus, so courts like this one must be particularly careful in making rulings that distinguish between challenges to fair representation under LMRA and Title VII.

### 2. *Statute of Limitations*

 The appropriate statute of limitations for a fair representation claim under Title VII is 300 days. *See Morris*, 994 F.Supp. at 171.[14] A claim for breach of DFR accrues when plaintiff first knew, or should have known, of the union's failure to adequately pursue her claim. *See Santos v. District Council*, 619 F.2d 963, 969 (2d Cir.1980) ("cause of action accrue[s] no later than the time when plaintiffs knew or reasonably should have known that such a breach [of the duty of fair representation]

had occurred, even if some possibility of nonjudicial enforcement remained"). As with the claim against AHP, the limitations period thus began on August 24, 1996. Any alleged incidents that occurred prior to August 24, 1996, can overcome the time bar only if Plaintiff can show that they constituted a continuing violation under *Cornwell.*

Cooper's Complaint describes, in considerable detail, a number of actions and inactions allegedly committed by the Union during the period from April 1996 (before the time limitations period) through early January 1997 (after the time limitations period): multiple failures by shop stewards to investigate her complaints about Dumas in a meaningful way during April, May and June of 1996; the failure by shop steward Rambin, who drafted Plaintiff's grievance concerning the Interview Record, to ferret out the true nature of her complaint; the Union's failure to file another grievance alleging sexual harassment even after it received Minter's June 20 letter and was formally made aware of the allegation; the closing of the Step 1 grievance hearing before all the evidence had been received; the failure to press AHP to process her Step 2 grievance without Dumas' being present; and the Union's failure to press AHP to transfer Dumas rather than Plaintiff. As noted above, these incidents give rise to two DFR claims: (1) failure to file a grievance alleging sexual harassment and retaliation despite her complaints of such behavior; and (2) failure to process the grievance that it did file in an appropriate and non-discriminatory fashion.

I turn first to whether the first claim is time-barred.

Viewing the facts most favorably to Plaintiff, the Union was placed on notice that Plaintiff believed her supervisor was sexually harassing her in the workplace on

---

14. Where plaintiffs bring DFR claims under the NLRA, the statute of limitations is six months. *See DelCostello v. International*

*Broth. of Teamsters*, 462 U.S. 151, 169–71, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).

June 20, 1996 (when Minter used those words in her communication to Plant Manager White).[15] And, as noted above, the last conceivable instance of sexual harassment at work took place no later than June 27, 1996. Under the Union's Collective Bargaining Agreement, § 7.14, grievances alleging a breach of the CBA's anti-discrimination clause had to be filed within 30 business days of the incident in order to be timely. (Rambin Aff. Ex. N, at 20.) Thirty business days after June 27, 1996 was August 9, 1996. Therefore, assuming arguendo that the Union breached its duty of fair representation by failing to file a grievance alleging sexual harassment and retaliation on Plaintiff's behalf, the breach occurred more than 300 days prior to the filing of Plaintiff's charge on June 17, 1997. So, necessarily, did any failure by the Union to investigate Cooper's allegations properly, so it could determine whether or not to file such a grievance.[16]

The fact that Plaintiff filed an EEOC charge within 300 days of her alleged constructive discharge is irrelevant to the timeliness of the charge of failure to file a sexual harassment grievance, because that discrete act long predated her alleged constructive discharge. Moreover, the Union was not her employer. It cannot discharge an employee. Union liability under Title VII to a member who is not also an employee of the Union is limited to failing to discharge its duty of fair representation. Plaintiff cannot bootstrap her theoretically separate claim against the Union onto a timely claim against the employer in order to avoid the time bar.

Neither, I conclude, can Plaintiff bootstrap her claim for failure to file a sexual harassment grievance onto the second aspect of her DFR claim—failure to pursue the grievance in a non-discriminatory manner—in order to avoid the statute of limitations. The Union's alleged failure to file a sexual harassment/retaliation grievance is a wholly separate act from any discriminatory failure to prosecute the grievance that was filed. Those two claims are theoretically, factually and logically distinct. The underlying incidents therefore do not constitute a continuing violation within the meaning of *Cornwell.*

Plaintiff's contentions concerning the processing of her June 11 grievance appear to be that the Union neither protested the employer's proffered solution (which she believed would constitute a demotion) and obtained a better one for her, nor took steps to process her grievance in a way she could endure (i.e., without Dumas). I conclude that this aspect of Plaintiff's claim is not time barred, because the various actions cited by Plaintiff in support of this claim either took place after August 24, 1996 or extended into that period (e.g. the Union's suspension of the grievance). The processing of the grievance was a single violation, and it logically falls under *Cornwell* as a continuing violation.

3. *Breach of Duty of Fair Representation*

Having disposed of the limitations issues, I now turn to whether the Union is entitled to summary judgment on the mer-

---

**15.** According to the evidence, certain Union representatives may have been aware of both a sexual relationship between Plaintiff and Dumas and harassing behavior by even earlier. For example, Michael Youhas, a shop steward, testified at his deposition that Plaintiff complained to him of sexual harassment during the period March–June 1996. However, for purposes of this motion, I am going to push the last date for filing a grievance back as far as I can. Even doing so, the date falls outside the 300–day limitations period, which begins on August 24, 1996.

**16.** In any event, these allegedly inadequate investigations—such as Youhas' tactics of walking into the Department where Plaintiff and Dumas worked in order to try to catch Dumas in the act of harassment, or his statement to Plaintiff that he could not be with her eight hours a day monitoring for harassment, or Michael Rambin's failure to investigate specifically for sexual harassment while he represented her—all took place in May and June of 1996, and are time-barred for that reason as well.

its of Plaintiff's remaining fair representation claim. I conclude that it is.

■ To make out a prima facie case of a breach of the duty of fair representation under a Title VII claim based on gender discrimination, Plaintiff must demonstrate "(1) that the Union Defendants breached their duty of fair representation by allowing an alleged breach to go unrepaired and (2) that the Union Defendants' actions were motivated by gender animus." *Doolittle v. Ruffo*, 88–CV–1175, 1996 WL 159850 at *4 (N.D.N.Y. March 27, 1996) (citing *Ross v. Communication Workers of America*, Local 110, No. 91 CIV. 6367 (LAP), 1995 WL 351462 at *7 (S.D.N.Y. June 9, 1995), *aff'd*, 1996 WL 80688 (2d Cir.1996)). *See also Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)(holding that plaintiff must show that the union's conduct was "arbitrary, discriminatory, or in bad faith."); *Gavenda v. Orleans County*, 95–CV–0251, 1997 WL 65870 at *5 (W.D.N.Y. 1997); *Morris v. Amalgamated Lithographers of America, Local One*, 994 F.Supp. 161, 169 (S.D.N.Y.1997)(applying the same standard to a claim of race discrimination). Applying the two-prong test to these facts, it seems clear that summary judgment is warranted in this case.

■ The undisputed facts show that Plaintiff failed and refused to participate in a Step 2 grievance hearing for some months following her departure from the workplace, and that the Union put the pending grievance on "hold" during that period of time. This "hold" extended into the limitations period. However, there is absolutely no evidence in the record that the grievance was placed on hold due to Plaintiff's gender, or that male grievants who were on leave or otherwise unable to attend hearings were treated any differently than she was. Thus, no rational trier of fact could conclude that the delay in processing her grievance to Step 2 constituted sexually discriminatory unfair representation.

■ On December 9, Plaintiff made her extraordinary, if understandable, request to have the accused (Dumas) barred from the Step 2 hearing and to permit her counsel to be present. AHP refused to permit Attorney Greene to attend the hearing. Plaintiff has not pointed to any provision in the CBA that allows outside counsel to be present at an internal grievance proceedings, and she has proffered no evidence that male grievants were allowed to bring their attorneys to such proceedings. In the absence of such evidence, no rational trier of fact could conclude that the Union's alleged failure to protest the employer's refusal to proceed in the presence of outside counsel constituted a discriminatory act in breach of its fair representation duty.

■ As for Dumas' presence, the most favorable evidence to Plaintiff's position is that Glover raised the issue with Gibberman, who responded, "Bob, you pick who you're going to bring and I'm going to pick who I'm going to bring." (Glover Dep. at 43–45.) Glover conceded that the Union did not make any further effort to persuade Gibberman to process the grievance without Dumas being present, and Gibberman (representing management) indicated that it was company policy to permit Dumas to attend the hearing.

However, Plaintiff does not suggest that the Union had any contractual or statutory right to dictate who management could or could not bring to the grievance. Nor does Plaintiff offer any evidence to suggest that the Union had ever battled management any harder when a male grievant made a similar request. As Plaintiff cites no basis for the Union's being able to compel management to handle matters in a manner she found acceptable, the Court construes her argument with respect to the Step 2 grievance hearing as, "You should have fought harder for me." She offers no evidence that the reason the Union did not try to obtain an exception for her case was gender-based. Glover testified, and Gibberman advised Plaintiff's

attorney, that it was possible for a Union official to represent a member at a grievance hearing without the member's being physically present. *See* Section III B. 2., *supra.* All that was required was that Plaintiff request in writing that the hearing be held in this manner. (Glover Dep. at 137.) Thus, Plaintiff, or at least her attorney, was aware of what was required if she wished to pursue the grievance without having to be in Dumas' presence. I conclude that in the absence of any proof that the Union had denied her any right in the grievance process, and thus that its actions resulted in her discrimination claim going unremedied, no rational trier of fact could conclude that the Union had failed in its duty to represent Plaintiff fairly.

### 4. Plaintiffs' Obligations under the Union Constitution and the Ellerth Defense

The Union makes an additional argument that also raises an issue of apparent first impression in this Circuit. It notes that the Union's Constitution expressly forbids sex discrimination. It then contends that Cooper's failure to avail herself of the internal union grievance procedure, and thereby to alert senior Union officials to possible sex discrimination of Union officials at the local level, insulates the Union from liability for the unauthorized acts of the local officers and stewards, under the reasoning of *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The Union's analysis of this issue is confusing and tends to conflate with its position on exhaustion of internal administrative union remedies. The interesting and novel issue, however, is whether the holdings of *Faragher* and *Ellerth* can be extended to shield a Union from DFR liability under Title VII.

The Plaintiff in *Ellerth* sued her former employer under Title VII on the ground that it was liable for the sexual harassment she endured from her former supervisor, harassment that went unreported to anyone in the Burlington management hierarchy. Although the employer was not on notice of the supervisor's behavior, plaintiff nonetheless argued that the employer was vicariously liable for the harassment. The district court granted summary judgment for Burlington on the ground that it did not know of the harassment. The district court also noted that the plaintiff had failed to take advantage of Burlington's internal complaint procedures. The Seventh Circuit reversed in an en banc decision encompassing a range of views about what standard should be applied to the vicarious liability of employers. Applying common law agency principles to determine employer liability, the Supreme Court held:

> [a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, *a defending employer may raise an affirmative defense to liability* or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257(emphasis added).[17]

The Court upheld the Seventh Circuit's reversal of summary judgment and remanded the case to determine whether

**17.** The Court applied the same holding to the facts of *Faragher,* decided the same day, which involved the liability of the City of Boca Raton for sexual harassment carried out by city lifeguards. *Faragher,* 524 U.S. at 796, 118 S.Ct. 2275.

Burlington could prove the affirmative defense. *Id.* at 766, 118 S.Ct. 2257.

The *Faragher–Ellerth* rule is an affirmative defense to liability, separate and apart from any requirements that an employee exhaust administrative remedies before filing suit. To analogize the affirmative defense to the union (as representative) relationship to the employee (as member of the union), a court would have to examine whether a union could argue as an affirmative defense that the union exercised reasonable care to prevent and correct sexual harassment, and that the employee/member unreasonably failed to take advantage of the available preventative measures.

Here, the Union points out that its constitution, which governs internal union policies and procedures, expressly prohibits sexual harassment.[18] The Union thus argues that, given these anti-discrimination provisions, if Cooper had concerns that the local Union's failure to bring and/or pursue the grievance was discriminatory or retaliatory, she was bound to give notice to the Union hierarchy (i.e. management beyond the local level) of her complaint.[19] Further, because the Union constitution expressly forbids it members, including its officers, from discriminating against a member based on sex, the Union argues that any such discrimination by members or officers of the local would be ultra vires

acts, not within the scope of their authority. Because Cooper failed to appeal to a higher level within the Union, and because the national Union was not put on notice of the alleged harassment, the Union contends that the principles of *Faragher–Ellerth* provide them with an affirmative defense to vicarious liability.

Cooper was unquestionably a member of the Union, at least from March 1996, which predates her complaints against the Union in this matter. She was, therefore, bound to utilize the appeal/protest procedure. On the record before me, there is no evidence that Cooper ever advised the Local management or its parent that anyone at the Local was failing and refusing to process her grievance against AHP and Dumas, or otherwise breaching the duty of fair representation, because of her race or her gender.[20] Cooper did file an unfair labor charge against the Local in November 1996, on the ground that the Local had failed to process her grievance. That charge, however, was withdrawn in February 1997.

On the record before me, it would appear the Union might have a supportable affirmative defense. But because I am dismissing the case on other grounds, I need not address this fascinating and novel application of *Ellerth*.[21]

---

**18.** The Union Constitution provides that "No person shall be refused membership or discriminated against because of nationality, race, color, sex, or religious belief." (1994 Uniform Local Union Constitution and By-Laws of the Int'l Chemical Workers Union, Art. III, § 2., attached to Vehar Aff. at Exh. 9.).

**19.** The Union has not briefed the Court on what level of management would have been the appropriate level to receive notice of Cooper's claim. Even if the Union is correct that *Ellerth* could be applied to a union, there is plenty of evidence in the record that most of the senior management at the local level was aware of and involved in Cooper's complaint.

**20.** The Union has not briefed the Court on what level of management would have been the appropriate level to receive notice of Cooper's claim. Of course, there is evidence in

the record that most of the senior management at the Local (Youhas and Glover both served on the Union Executive Board) was aware of and involved in Cooper's complaint about the AHP proposal to remedy the alleged harassment.

**21.** In another case involving an equally novel application of agency principles to Union liability under Title VII, Judge Coar of the Northern District of Illinois analyzed a union's ability to mount an affirmative defense to a charge that it was jointly liable with the employer for a racially hostile work environment. *See U.S. E.E.O.C. v. Foster Wheeler Constructors, Inc.,* 1999 WL 507191, No. 98 C 1601 (N.D.Ill. July 6, 1999). In that case, the Plaintiff–Intervenor complained of a racially hostile work environment and alleged that the Union was responsible for the hostile environment because it had allowed portable toilets

Defendant Union's motion for summary judgment is granted and the claims against it dismissed.

## V. CLAIM AGAINST DUMAS

The remaining claim against Richard Dumas is a single alleged violation of the New York Human Rights Law § 296(6), for aiding and abetting liability. Having declined to exercise supplemental jurisdiction over AHP's state law claims, I also decline to exercise jurisdiction over the claim against Dumas.

This constitutes the decision and order of this Court.

to be left covered with racially offensive graffiti and had not taken effective steps to remove the graffiti and prevent its recurrence. *U.S. E.E.O.C.*, 1999 WL 507191 at *1. The EEOC took up the Plaintiff–Intervenor's claims and sued both the employer and the union on the grounds that: the supervisor of the facility served concurrently as supervisor and union shop steward; he had actual knowledge of the offensive graffiti; and he did nothing to remedy the situation. The Union moved for summary judgment on the grounds that the EEOC had failed to demonstrate that the union's conduct had been intentional and/or that the supervisor was acting within the scope of his actual or apparent authority.

Judge Coar rejected the EEOC's attempt to analogize its theory of "joint control" by the union and employer to the doctrine of "joint employer" liability under Title VII. Citing

*Goodman v. Lukens Steel Co.*, 482 U.S. 656, 665–67, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987) the court reasoned that because unions can only be held liable under Title VII where their behavior "contributes or intentionally acquiesces" to the discrimination, a union cannot be made liable under simple application of the "joint employer" theory; liability rested on whether the supervisor's inaction and acquiescence could be imputed to the union. On the facts before him, Judge Coar concluded that there was a dispute as to whether the supervisor was the agent of the union with responsibility for responding to complaints about working conditions (i.e.,the shop steward), and therefore denied the union's motion for summary judgment. He found it unnecessary to address whether the *Ellerth* standard for insulating employers from liability applied.