Gloria **WILBURN**

v.

**FLEET FINANCIAL GROUP, INC., Thomas Coville**

**No. 3:99CV1542(JBA).**

United States District Court, D. Connecticut.

Sept. 10, 2001.

Kenneth W. Williams, Solomon, Krupnikoff & Wyskiel, Meriden, CT, for Gloria Wilburn.

Richard Voigt, Cummings & Lockwood, Hartford, CT, Felix J. Springer, Victoria Woodin Chavey, Day, Berry & Howard, Hartford, CT, Janet Marie Helmke, Edwards & Angell, Hartford, CT, Gary W. Flanagan, Edwards & Angell, Providence, RI, for Fleet Financial Group, Inc.

Matthew Joseph Collins, Manchester, CT, for Thomas Coville.

## MEMORANDUM OF DECISION ON FLEET'S MOTION FOR SUMMARY JUDGMENT [Doc.##46, 68]

ARTERTON, District Judge.

Plaintiff Gloria Wilburn claims that defendants, her former employer Fleet Financial Group, Inc. ("Fleet") and former supervisor Thomas Coville, subjected her to a hostile work environment through Coville's sexually harassing conduct and retaliated against her after she filed a complaint with the Commission on Human Rights and Opportunities ("CHRO"), in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.* and the Connecticut Fair Employment Practices Act, Conn. Gen.Stat. § 46a–51 *et seq.* ("CFEPA"). Plaintiff also asserts state law claims of assault and battery, invasion

of privacy, and the negligent and intentional infliction of emotional distress against both defendants. Finally, plaintiff claims that defendant Fleet is liable for negligent supervision.

Defendant Fleet has moved for summary judgment on seven of the nine counts against it [Doc. #46].[1] For the reasons set forth below, Fleet's partial motion for summary judgment is granted in part and denied in part.

## I. Factual Background [2]

Ms. Wilburn was hired by Fleet's predecessor, Shawmut Bank, on a part-time basis in December 1994. Fleet's Statement of Uncontested Facts at ¶¶ 1–2. Several months later, Fleet promoted her to the full-time position of "Unit Adjuster" (collections agent) in its Auto Finance Division. *Id.* At that time, her direct supervisor was Dorothy "Dot" Kirouac; Ms. Kirouac's direct supervisor was Thomas Coville, manager of the "Auto Dialer Unit" and co-defendant in this action. *Id.*

Plaintiff states that in March of 1995, Coville initiated a pattern of sexual harassment and sexual assault against her that continued unabated through a period of time in which she was absent from work on disability leave on an unrelated medical condition in December 1996 and January 1997 and finally ended with her last day of work on February 11, 1997. Plaintiff states that this conduct included, but was not limited to: (1) sexually harassing questions regarding her breasts and undergarments; (2) unwanted touching and grabbing of her breasts, buttocks, and genital area; (3) inappropriate "TOSS mail" sent through the Fleet e-mail system; and (4) sexually explicit voice-mails left at plaintiff's home telephone number. Coville admits to having sent the e-mail and left voice-mail messages to Ms. Wilburn—however, he avers that these messages were part of a consensual exchange initiated by the plaintiff.[3]

Fleet's "Freedom from Harassment" Policy directs employees to "report all incidents of a harassing nature to the local Human Resources Department and to management." Plaintiff, however, claims that she was unaware of Fleet's grievance procedures because Fleet failed to distribute or conspicuously post its "Freedom from Harassment" policy. Although plaintiff discussed the harassment with her co-workers, she states that she never reported it because she feared losing her job.

In December of 1996, plaintiff called the general 1–800 number for Fleet Human Resources. She informed the operator that she was having a problem with a co-worker, but did not mention sexual harassment or Thomas Coville. The operator gave plaintiff the number for the Employee Assistance Program (EAP), a social work service under contract with Fleet to provide counseling for Fleet employees. Plaintiff states that she called the EAP social worker as directed and spoke with

---

**1.** Fleet moves for summary judgment on Counts One and Four (sexual harassment under Title VII and CFEPA); Counts Two and Five (retaliation under Title VII and CFEPA); and Counts Eight, Nine, and Ten (negligent infliction of emotional distress, invasion of privacy, and negligent supervision, respectively). Fleet does not move for summary judgment on Count Six (intentional infliction of emotional distress) or Count Seven (assault and battery). Count Three is a separate Title VII retaliation claim brought solely against

defendant Thomas Coville, who has not moved for summary judgment.

**2.** This section presents a brief summary of the relevant factual background. Additional facts are discussed in greater detail in the Discussion section.

**3.** Deposition of Thomas Coville taken December 6, 2000 (hereinafter "Coville Dep. II") at 145–147.

her about the harassment; plaintiff was told by the social worker that her complaint would not be reported to Fleet and was not given any information about the alternative avenues of complaint which Fleet now claims plaintiff unreasonably failed to utilize. Plaintiff set up an in-person appointment with the social worker but later canceled it because the social worker made her feel uncomfortable.

Plaintiff took an extended leave of absence in December and January of 1996 to recover from knee surgery. During this absence, Coville left sexually explicit voice-mail messages on plaintiff's home telephone. On December 26, 1996, plaintiff filed a formal complaint with the CHRO alleging sexual harassment. In response, Fleet Human Resources interviewed Coville, Kirouac, and other employees in the Auto Dialer Unit. However, plaintiff was not interviewed, and the investigation was termed "inconclusive."

When Ms. Wilburn returned to work on February 11, 1997, Fleet transferred her to a lateral position under a different manager in the Auto Finance Division. However, Ms. Wilburn's desk was still within one hundred feet of Thomas Coville's cubicle. Plaintiff claims that on the day of her return Coville confronted her outside the women's restroom and told her in a threatening tone that she was "not going to get away with anything."[4] After conferring with her then-attorney Kimberly Graham, plaintiff left work and never returned. Her formal resignation was effective April 8, 1997.

## II. Discussion

### A. *Summary Judgment Standard*

Summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 107 (2d Cir. 1998). After the moving party meets this burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir.1994).

The Second Circuit has recently held that "trial courts should not treat discrimination differently from other ultimate questions of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (*citing Reeves v. Sanderson Plumbing*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). On a motion for summary judgment in an employment discrimination case, courts must distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. *See Bickerstaff v. Vassar*

---

4. Deposition of Gloria Wilburn taken June 21, 2000 (hereinafter "Wilburn Dep. I") at 153–54.

*College,* 196 F.3d 435, 448 (2d Cir.1999). This determination should not be made through guesswork or theorization. *See id.* Instead, viewing the evidence as a whole and taking into account all of the circumstances, the Court must determine whether the evidence can reasonably and logically give rise to an inference of discrimination. *See id.*

B. *Sexual Harassment Under Title VII and CFEPA*

■ Fleet argues that it is entitled to summary judgment on plaintiff's sexual harassment claims based on the affirmative defense enunciated by the U.S. Supreme Court in *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Indus. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Alternatively, Fleet contends that plaintiff cannot establish that the described conduct was unwelcome—an element of her prima facie case of sexual harassment. For the reasons set forth below, Fleet's motion for summary judgment is denied as to Counts One and Four, plaintiff's sexual harassment claims.[5]

*1. The Faragher/Ellerth defense*

■ Under *Faragher* and *Ellerth,* an employer is presumed liable for the sexual harassment of an employee by her supervisor. *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 764, 118 S.Ct. 2257. However, in a claim of a hostile work environment that does not culminate in a tangible employment action, the employer may escape liability by showing: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b)

that the plaintiff employee failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275.

■ Generally, a tangible employment action occurs where a supervisor acts with the employer's authority and makes a decision that "inflicts direct economic harm" on the employee and "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 524 U.S. at 761, 762, 118 S.Ct. 2257. As explained by the Supreme Court in *Ellerth,*

> Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control. Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act.

*Id.*

■ As a threshold matter, plaintiff argues that Fleet cannot avail itself of the *Faragher/Ellerth* affirmative defense because she suffered a tangible employment action when "Defendant Coville, through his refusal to evaluate [plaintiff] or consent to [her] transfer, kept the Plaintiff in her employment condition and under his supervision to her detriment."[6]

---

5. Plaintiff's state law Fair Employment Practices Act are governed by the same standards applicable to her Title VII claims. *See Miko v. CHRO,* 220 Conn. 192, 204, 596 A.2d 396

(1991); *Levy v. CHRO,* 236 Conn. 96, 107–08, 671 A.2d 349 (1996).

6. Wilburn Memo. at 15, n. 3. Plaintiff does not argue that her alleged constructive dis-

However, contrary to plaintiff's counsel's representation at oral argument that Ms. Wilburn stated in her deposition that she had been offered a position working with another manager, and that Coville had blocked the transfer, there is no mention of any such job offer anywhere in the testimony submitted by the parties. Accordingly, as the Court finds no factual basis for plaintiff's assertion that Coville refused to consent to her transfer to another department, plaintiff cannot rely on this as a tangible employment action.

As for plaintiff's argument that Coville's failure to evaluate her was a tangible employment action, assuming *arguendo* that such an action amounts to a significant change in employment status, there is no evidence from which a reasonable jury could conclude that Coville's failure to evaluate plaintiff's performance was in any way related to the pattern of sexual harassment such that the harassment could reasonably be said to have "culminated" in the refusal to evaluate. *See Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir.2001) ("If the supervisor's harassment did not culminate in a 'tangible employment action,' ... an employer may avoid liability" by proving its entitlement to the affirmative defense) (citations omitted). According to plaintiff's own testimony, she asked Coville about the status of her performance evaluation shortly before she went on leave for knee surgery.[7] According to plaintiff, Coville replied that Dot Kirouac had not yet submitted the evaluation, and that it would be completed by the end of the week.[8] Plaintiff did not

receive an evaluation by the end of the week, however, and Coville told her to wait until she returned from medical leave.[9] Therefore, in the absence of any evidence suggesting a discriminatory animus behind Coville's failure to evaluate plaintiff, and in light of plaintiff's own testimony that she was not evaluated because Ms. Kirouac had not yet completed the evaluation prior to plaintiff's voluntary absence on medical leave, the Court concludes that Fleet may raise the *Faragher/Ellerth* affirmative defense.

As noted above, under this defense, an employer can avoid liability for a supervisor's harassment of a subordinate if it demonstrates by a preponderance of the evidence that (a) it exercised reasonable care in preventing and correcting any sexually harassing behavior and (b) the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities. As the party bearing the burden of proof on this defense at trial, summary judgment is inappropriate unless Fleet has come forward with evidence demonstrating an entitlement to this defense as a matter of law.

■ In proving "reasonable care" under the first prong of the *Faragher/Ellerth* affirmative defense, whether an anti-harassment policy has been effectively published and disseminated among the employees is an "important consideration" in determining whether the defendant has met its burden under the first prong. *Faragher*, 524 U.S. at 808–09, 118 S.Ct. 2275. In *Faragher*, a city lifeguard sued the City of Boca Raton for sexual harass-

---

charge constitutes a tangible employment action within the meaning of *Faragher* and *Ellerth*. *See Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir.1999) (constructive discharge not a tangible employment action), *cert denied sub nom.*, 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000).

7. Deposition of Gloria Wilburn taken August 23, 2000 (hereinafter "Wilburn Dep. II") at 58.

8. *Id.*

9. *Id.*

ment by two of her supervisors. The Supreme Court reinstated the district court verdict for the plaintiff, holding as a matter of law that the City could not satisfy the first prong of the affirmative defense, notwithstanding the existence of a sexual harassment policy, because it "had entirely failed to disseminate its policy against sexual harassment among the beach employees and . . . made no attempt to keep track of the conduct of [its] supervisors[.]" *Id.* at 808, 118 S.Ct. 2275; *see also Meng v. Ipanema Shoe Corp.,* 73 F.Supp.2d 392, 401 (S.D.N.Y.1999) (summary judgment inappropriate where there were factual disputes as to whether the plaintiff employee had received a copy of defendant employer's sexual harassment policy when she was hired, and whether defendant adequately explained its policy during a sexual harassment seminar); *O'Dell v. Trans World Entertainment Corp.,* 153 F.Supp.2d 378, 389–90 (S.D.N.Y.2001) (holding that defendant employer satisfied first prong of affirmative defense because it had an effective anti-harassment policy that was received and reviewed by plaintiff when she was hired); *P. v. Delta Air Lines, Inc.,* 102 F.Supp.2d 132, 140 (E.D.N.Y.2000) (factors relevant to determining whether an employer has provided a reasonable avenue for complaint include, inter alia, whether the policy is seriously enforced, whether employees are informed how to report sexual harassment, and whether the policy is effectively communicated to employees).

Fleet argues that it is entitled to summary judgment because it has satisfied both prongs of the *Faragher/Ellerth* affirmative defense. Regarding the first prong, Fleet claims that it exercised reasonable care to prevent sexual harassment by distributing and posting a "strong and clearly worded" anti-harassment policy.[10] Fleet further contends that it conducted a "prompt and thorough investigation," which was inconclusive because plaintiff was not available to be interviewed. In response, Ms. Wilburn argues that she was unaware of the Fleet policy because it was neither effectively distributed nor conspicuously posted. Plaintiff also argues that Fleet's sexual harassment policy was not enforced in the Auto Dialer Unit, stating that employees in the Auto Dialer Unit openly held sexually explicit conversations, and that Mr. Coville was permitted to supervise his wife Sharon (allegedly in violation of Fleet's policy). Plaintiff further argues that Fleet ignored evidence that Coville had previously violated the anti-harassment policy.

■ For the following reasons, the Court concludes that Fleet has failed to meet its burden of proving the absence of any genuine issue of disputed fact as to whether it effectively distributed and enforced the sexual harassment policy.

First, Fleet's "Freedom From Harassment Policy" provides that:

> Managers will conduct at least one staff meeting a year to formally address the [policy]. During this meeting, employees will be directed to report any incidents of a harassing nature to the local Human Resources Department and to management. *Managers will assure distribution of [the policy] to all employees during this meeting.*[11]

However, plaintiff points to testimony from former co-workers Carol Zene, Migdalia Cahill, and Tracy Neal, indicating that no such meetings were ever held in the Auto Dialer Unit.[12] Moreover, Fleet

---

10. Fleet Memo. at 20.

11. Fleet Policy at 2 (emphasis added).

12. *See* Deposition of Carol Zene (hereinafter "Zene Dep.") at 13; Deposition of Migdalia Cahill (hereinafter "Cahill Dep.") at 23; De-

has not identified any witnesses who claim to have attended any such meetings. Even more telling, however, is the fact that Coville, whose responsibilities as manager included distributing the sexual harassment policy in the Auto Dialer Unit, testified in his deposition that he never distributed the policy, never held a meeting to review the policy, and in fact did not even know whether Fleet had had an anti-harassment policy during the time period at issue.[13]

In addition, notwithstanding Fleet's unsupported allegation that it distributed the policy to all employees, plaintiff has submitted evidence from which a reasonable jury could conclude that employees in the Auto Dialer Unit did not receive a copy of the policy or see it conspicuously posted. Although Thomas Coville testified that he was "99 percent sure" that a memo on sexual harassment was posted near the elevator bank in the Auto Dialer Unit, his conflicting testimony that he was not sure whether Fleet had a sexual harassment policy in effect in 1995 to 1997 could permit a jury to conclude that no such policy was posted.[14] Further, while plaintiff's former co-worker Constantina "Connie" Santos recalled seeing a sexual harassment policy posted in a break room located on a different floor than the Auto Dialer Unit,[15] both Carol Zene and Tracy Neal testified in their depositions that they never saw a sexual harassment policy at Fleet.[16] In-

deed, Carol Zene testified that she was sure that there was no policy posted on the bulletin board in the break room or near the elevator.

■■■ In light of these factual disputes, Fleet has not shown by undisputed evidence that it exercised reasonable care to prevent sexual harassment. "The question of whether an employer has provided a 'reasonable avenue of complaint' is a question for the jury." *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1181 (2d Cir. 1996); *accord Gallagher v. Delaney*, 139 F.3d 338, 348 (2d Cir.1998); *see generally Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1027–28 (10th Cir.2001) (defendant mining company failed to satisfy first prong of affirmative defense because uncontroverted evidence indicated that the policy was not posted in the women's changing room, and that the policy was largely ignored). Accordingly, Fleet has not established as a matter of law that it is entitled to the *Faragher/Ellerth* affirmative defense, and the Court does not reach Fleet's contention that plaintiff unreasonably failed to avail herself of the preventative opportunities provided by Fleet.

### 2. Unwelcome Conduct

■■■ Alternatively, Fleet argues that summary judgment should be granted on plaintiff's sexual harassment claims be-

---

position of Tracy Neal (hereinafter "Neal Dep.") at 14–15.

**13.** *See* Deposition of Thomas Coville taken March 15, 2000 (hereinafter "Coville Dep. I") at 48, 55. The Court also notes that defendant Coville's cross-claim against Fleet, now dismissed, alleged that any recovery should be exclusively against Fleet in part because "Fleet failed to provide training as to the nature and hazards of engaging in sexual banter with co-employees." Cross–Complaint [Doc. # 18], ¶ 3c. Although Fleet now argues that Coville's deposition testimony, which is

inconsistent with a sworn affidavit he previously signed stating that he had received the policy, was an attempt to bolster the then-pending cross-claim, such factual dispute is not properly resolved on summary judgment.

**14.** Coville Dep. II at 169–70; Coville Dep. I at 48, 55.

**15.** Deposition of Constantina Santos (hereinafter "Santos Dep.") at 14–15, 17.

**16.** Zene Dep. at 8, 11–12; Neal Dep. at 13.

cause the undisputed facts make clear that Ms. Wilburn cannot establish that Coville's conduct was unwelcome. For the reasons discussed below, the Court concludes that Ms. Wilburn has submitted evidence sufficient to raise a material factual dispute as to unwelcomeness, thus precluding entry of summary judgment.

 "To prevail on a hostile work environment claim, a plaintiff must demonstrate: (1) that [her] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [her] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997). To be actionable, a "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

 In considering whether the environment is sufficiently hostile, the Court must look at the totality of the circumstances. *See Schwapp,* 118 F.3d at 111 (*citing Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). " 'One of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere . . .—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim.' " *Perry v. Ethan Allen Inc.,* 115 F.3d 143, 149 (2d Cir.1997) (*quoting Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir.1987)).

 The Supreme Court has held that "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (citations and internal quotation marks omitted); *accord Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777, 784 (1st Cir.1990) (plaintiff must show that "the advances were uninvited and offensive or unwanted from the standpoint of the employee."). In many cases, "the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Meritor,* 477 U.S. at 68, 106 S.Ct. 2399.

Fleet asserts that Coville's conduct was welcome, citing testimony of Ms. Wilburn that: (1) she never told Coville to stop touching her; (2) she never told him to stop sending the voicemail messages; (3) she never told him to stop sending explicit e-mails; (4) she never complained about Coville to any supervisor, manager, or Human Resources representative at Fleet; and (5) she herself had used sexually explicit language in conversations with co-workers at Fleet and outside of the office.[17]

In support of its assertion that plaintiff consented to and indeed initiated Coville's sexual advances, Fleet also points to Ms. Wilburn's psychological evaluation, which states that:

> Ms. Wilburn admitted that she had had a dream that she and Mr. Coville were sexually intimate. She thought it was funny to have such a dream and she claimed that she innocently shared it with Mr. Coville. When confronted, Ms. Wilburn claimed that she did not know

---

**17.** There is no dispute that the conduct alleged by Ms. Wilburn, if unwelcome, was sufficiently severe and pervasive to alter the conditions of her working environment.

that sharing such information with her manager was professionally inappropriate. Ms. Wilburn was adamant that she had no intention of being sexually suggestive or wanting a personal/sexual relationship with Mr. Coville.

Plaintiff's Expert Report at 10. According to Fleet, this statement rebuts plaintiff's claim that she never engaged in sexual communication with Coville and, as it is consistent with Coville's account of how the communications began, shows that she initiated the sexual exchange. Coville claims that in June or July of 1995 Ms. Wilburn sent him a sexually explicit e-mail message in which she recounted an erotic dream that she had had about him the night before, and described scenes of sexual intercourse, cunnilingus, and fellatio.[18] Coville states that he and Wilburn exchanged "five or six" sexually explicit e-mail messages before he stopped the exchange out of concern that Fleet might be monitoring their e-mails.[19] After Coville suggested that they stop communicating by e-mail, he states that Ms. Wilburn then gave him her home telephone number for the purpose of exchanging erotic voice-mail messages, and that the two ex-changed between 15 and 20 such messages over the next year and a half.[20]

Plaintiff, in turn, denies that Coville's conduct was welcome, and claims that she rebuffed his advances. According to Ms. Wilburn's deposition testimony, Coville began verbally harassing her in March of 1995, frequently asking questions about the size, color, and style of her undergarments.[21] Ms. Wilburn's response was to "laugh it off," and she refused to answer any of the questions.[22] She further stated that, "[a]t one point in [1995] I just told [Coville] I wasn't interested."[23]

■ Plaintiff also stated that Coville would brush his elbow or forearm against her breasts while speaking with her either at his desk or at her work station, and that she told Coville that she did not appreciate this conduct.[24] While plaintiff does not recall specifically when these brushings occurred, she claims they happened rather frequently.[25] Plaintiff's former co-workers recall that Coville used to flirt with plaintiff about her breasts and that he was "always leaning over her cubicle," and frequently would take her into the conference room.[26] These co-workers also heard plaintiff complain that Coville was harassing her.[27] Carol Zene stated that "from

---

**18.** Coville Dep. II at 131–32.

**19.** *Id.* at 139–41.

**20.** *Id.* at 139–46.

**21.** Wilburn Dep. I at 65, 78.

**22.** Deposition of Gloria Wilburn taken December 7, 2000 (hereinafter "Wilburn Dep. III") at 36; Wilburn Dep. I at 67.

**23.** *Id.* at 78.

**24.** Wilburn Dep. III at 39.

**25.** Wilburn Dep. I at 79. Plaintiff's failure to recall the exact dates or circumstances of some of the harassment does not preclude her reliance on this conduct as evidence of perva-sive harassment. *See Torres v. Pisano,* 116 F.3d 625, 631 (2d Cir.1997).

**26.** *See, e.g.,* Zene Dep. at 22–24.

**27.** Zene Dep. at 27, 50; Cahill Dep. at 44; Neal Dep. at 15–16, 19–21. Carol Zene testified that Coville would frequently tell plaintiff that he needed her in the conference room, and that in response, plaintiff would roll her eyes "up in her head" and sigh before joining him. Zene Dep. at 23. Ms. Zene testified that plaintiff, in response to Coville's advances, "used to curse and then, like, make a loud noise and then go to the bathroom." Zene Dep. at 75. Ms. Zene also stated that plaintiff would tell her that Coville had taken her into the conference room to tell her "[t]hat he want to go out with her. He want to take her out... When can he go out? Can

what we saw on the floor ... Gloria didn't want to be bothered" by Coville.[28]

Carol Zene and Tracy Neal also testified in their depositions that plaintiff frequently asked that they drive her home so that Coville would not offer to give her a ride.[29] Moreover, Neal heard Coville ask plaintiff if she needed a ride home. According to Neal, "[Coville] would suggest, Do you need a ride home? And [plaintiff] would look at me and I'll know, okay, I'm taking her home." [30]

According to Ms. Wilburn, the flirting and brushing eventually evolved into three more serious incidents of unwanted touching.[31] The first such incident took place while plaintiff was alone with Coville in the seventh floor conference room. Plaintiff says that she went to the conference room with Coville to discuss a work-related issue, and that once they were inside Coville closed the door and began fondling her breasts. Plaintiff states that she told Coville to "move" so that she could exit the conference room. The second incident occurred at Coville's desk. Plaintiff states that Coville again grabbed her breasts, and that this time there was a witness,[32] although none of the deponents recall witnessing this incident.[33] In the third incident, plaintiff states that Coville was explaining a project to her when he suddenly reached "between my legs" and grabbed at her genital area.[34] Plaintiff was so upset that she burst into tears, grabbed her coat and pocketbook, and left work for the day.[35]

Plaintiff also states that Coville sent her several inappropriate e-mails on Fleet's "TOSS Mail" system.[36] The parties have submitted five of those e-mails as evidence.[37] On April 30, 1996, Coville e-mailed Wilburn asking, "so when can I run my hands all over your body[?]" [38] The remaining four e-mails, although not sexually explicit, support plaintiff's claim that Coville consistently offered her rides home.[39] Ms. Wilburn claims not to have responded to Coville's e-mails, and Fleet has not provided any evidence rebutting plaintiff's claim.

In addition, plaintiff has submitted transcripts of recorded messages that Coville had left on her home voice-mail describing

he get with her?" *Id.* at 64. Neal similarly verified that Coville "would sometimes take [plaintiff] in[to] a little conference room or whatever and they would, you know, I don't know, I guess talk," and that plaintiff would often come back looking upset. *Id.* at 16, 19.

**28.** *Id.* at 50.

**29.** Zene Dep. at 27, 50; Neal Dep. at 19–20.

**30.** *Id.* at 20.

**31.** *Id.* at 96.

**32.** *Id.* at 47.

**33.** Deposition of Alfred Parker at 47; Santos Dep. at 32–33; Zene Dep. at 65; Neal Dep. at 52.

**34.** Wilburn Dep. III at 59–60.

**35.** *Id.* at 85–86.

**36.** Wilburn Dep. III at 42. Plaintiff's former co-worker Migdalia Cahill testified that on one occasion in the women's restroom, plaintiff appeared angry and was talking about "su[ing] the pants off of" Coville for sexual harassment. Cahill Dep. at 29–30, 39. According to Ms. Cahill, plaintiff "wasn't crying, but she was angry. It's sort of like she just— something just happened to her." *Id.* at 30. Cahill was not sure what had happened, but testified that she thought it had something to do with the TOSS messages that Coville had sent to the plaintiff. *Id.* at 32.

**37.** *See* Plaintiff's Ex. L: E-mails Sent by Thomas Coville (hereinafter "Coville E-mails").

**38.** *Id.*

**39.** Wilburn Dep. II at 95.

sexual acts that he wanted to perform with plaintiff in explicit detail.[40] Although Coville stated in his deposition that the plaintiff had left him equally explicit messages on his voice-mail at work, Fleet has not submitted any evidence of those messages.[41] Plaintiff claims in her brief that she refused to answer the phone when Coville was calling her at home, and that she found his voice-mail messages subjectively offensive, although her deposition testimony was that her reaction to Coville's first sexually explicit message was to, "pay it no mind. I just basically said, 'He is sick.' "[42] However, Carol Zene testified that plaintiff had her listen to the messages, and that plaintiff told her that "she was scared to answer her phone."[43]

Although Fleet makes much of Mr. Coville's claims that plaintiff sent him sexually explicit e-mail and voice-mail messages, the only evidence in the record of those messages is Coville's own testimony, and plaintiff has denied Coville's claims of a reciprocal exchange of messages.[44] In the absence of any evidence in the record—apart from Coville's testimony—that the exchange of e-mails and voice-mails was a consensual exchange, rather than one-sided harassment as Ms. Wilburn claims, this Court cannot find as a matter of law that the conduct alleged by Ms. Wilburn was welcome.

■ Although the evidence supports Fleet's position that plaintiff once mentioned a dream she had about Mr. Coville to him, this bears on the credibility of Ms. Wilburn's subsequent denials of consensual conduct, and without more cannot demonstrate the absence of disputed fact as to welcomeness.[45] *See generally Weinsheimer v. Rockwell Int'l Corp.*, 754 F.Supp. 1559, 1564, n. 12 (M.D.Fla.1990) ("The Court does not hold that this plaintiff's, or any plaintiff's, participation in actions of a sexual or vulgar nature while at work will completely bar a claim of sexual harassment. Plaintiff simply must show that at some point she clearly made her co-workers and superiors aware that in the future such conduct would be considered 'unwelcome.' "), *aff'd without op.*, 949 F.2d 1162 (11th Cir.1991); *Babcock v. Frank*, 729 F.Supp. 279, 288 (S.D.N.Y.1990) (employee stated cause of action under Title VII when she claimed that following the termination of a consensual relationship with her supervisor, her supervisor threatened to terminate her if she did not resume the relationship); *Scelta v. Delicatessen Support Servs., Inc.*, 89 F.Supp.2d 1311, 1318 (M.D.Fla.2000) ("The fact that Plaintiff may have had, at one point in time, a consensual sexual relationship with a supervisor does not provide that supervisor, or any other supervisor or co-worker, with a right to sexually harass Plaintiff.").

**40.** *See* Coville Dep. I at 62–77.

**41.** Coville Dep. II at 143–47; Coville Dep. I at 224.

**42.** Wilburn Dep. III at 85–86.

**43.** Zene Dep. at 31.

**44.** Wilburn Dep. III at 88; *see also* Wilburn Dep. II at 95 (testifying that she had never sent an e-mail message to anybody at Fleet).

**45.** In addition, Fleet has put forth no explanation as to why it could not produce copies of email messages allegedly sent to Mr. Coville by plaintiff from her computer at work if such evidence existed. Again, the Court notes that Coville's cross-complaint against Fleet alleged that "Fleet failed to preserve inner and interdepartmental communications between the Defendant Coville and the Plaintiff that would have revealed the consensual nature of the relationship." Cross–Complaint, at ¶ 3(b). This allegation underscores the absence of critical proof from Fleet's motion for summary judgment.

Finally, Fleet argues in its supplemental motion that evidence of Ms. Wilburn's consensual sexually explicit exchanges with other people from computer chat rooms reproduced from her personal computer suggests that her denials that communications from Mr. Coville were unwelcome are incredible. While such evidence, in light of plaintiff's repeated denials of such exchanges during her deposition, certainly impacts her credibility, as Fleet's counsel admitted at oral argument, it cannot establish as a matter of fact or law that Coville's conduct was necessarily welcome.

 "A person's private and consensual sexual activities do not constitute a waiver of his or her legal protections against unwelcome and unsolicited sexual harassment." *Katz v. Dole*, 709 F.2d 251, 254 n. 3 (4th Cir.1983). As the Eighth Circuit astutely observed in *Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 963 (8th Cir.1993), the fact that a plaintiff engages in sexualized conduct outside work cannot mean that uninvited sexual advances of her employer were not offensive as a matter of law:

> This rationale would allow a complete stranger to pursue sexual behavior at work that a female worker would accept from her husband or boyfriend. This standard would allow a male employee to kiss or fondle a female worker at the workplace. None of the plaintiff's conduct [posing naked for a national magazine], which the court found relevant to bar her action, was work related. [Plaintiff] did not tell sexual stories or engage in sexual gestures at work. She did not initiate sexual talk or solicit sexual encounters with co-employees. Under the trial court's rationale, if a wom-

an taught part-time sexual education at a high school or college, a court would be compelled to find that sexual language, even though uninvited when directed at her in the work place, would not offend her as it might someone else who was not as accustomed to public usage of the terms.

*Id.*

 In summary, Fleet argues that summary judgment is appropriate because under the totality of the circumstances plaintiff's mere denials cannot create a disputed fact as to unwelcomeness. However, viewing the evidence in the light most favorable to the plaintiff, the Court finds that a jury reasonably could conclude that the conduct described by plaintiff was unwelcome. Moreover, the testimony of plaintiff's co-workers would permit a reasonable jury to find that Ms. Wilburn deliberately avoided situations in which she might be alone with Coville, and that plaintiff was frequently pulled aside by Coville and returned upset, thus confirming plaintiff's version of the events. From all this, the jury could conclude that Coville's conduct was unwelcome and interfered with Ms. Wilburn's working conditions, despite the absence of any direct testimony from plaintiff that she explicitly told Coville that all his conduct was unwelcome. As the above review of facts makes clear, the parties' versions of the relevant events differ significantly, and the determination of whether Ms. Wilburn's claims that Mr. Coville's conduct was unwelcome are credible cannot be resolved by the Court at this juncture. Thus, Fleet's motion for summary judgment is denied as to the sexual harassment claims.[46]

---

**46.** Additionally, Fleet argues that it even if it is liable for sexual harassment, it cannot be held liable for punitive damages because it "acted reasonably and in good faith in at- tempting to prevent and rectify the sexual harassment[.]" Fleet Memo. at 23, n. 14. In support of this contention, Fleet cites *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 545,

C. *Retaliation Under Title VII and CFEPA*

Fleet also argues that it is entitled to summary judgment on plaintiff's retaliation claims because plaintiff cannot establish that she either participated in a protected activity or suffered an adverse employment action as a result of that activity. For the reasons set forth below, the Court agrees that Fleet is entitled to summary judgment on plaintiff's retaliation claims (Counts Two and Five).

 Title VII prohibits an employer from "discriminat[ing] against any of its employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation, a plaintiff must show that "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir.2001) (citations and internal quotation

marks omitted); *accord Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998).

 Fleet first argues that plaintiff cannot claim retaliation because she never participated in a protected activity. "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination[,]" *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000), such as filing a sexual harassment complaint with a government agency. *See Raniola*, 243 F.3d at 626 (filing an EEOC complaint is a protected activity); *Quinn*, 159 F.3d at 759 (filing state agency complaint is protected activity). Plaintiff filed her CHRO complaint on December 26, 2000, and Fleet was served with a copy of that complaint on January 6, 2001. The filing of a CHRO complaint is clearly a protected activity under Title VII. *See Raniola*, 243 F.3d at 626; *Quinn*, 159 F.3d at 769. Therefore, Fleet's argument that plaintiff's retaliation claim must fail because she never engaged in protected activity is unavailing.

 Fleet also contends that plaintiff cannot establish that she suffered an adverse employment action in retaliation for her complaint. For purposes of a Title VII retaliation claim, an "adverse employment action" constitutes a "materially adverse change" in the employee's working

119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), which held that "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where [those] decisions are contrary to the employer's 'good-faith efforts to comply with Title VII.' " In determining whether punitive damages should be awarded in a Title VII claim, the trier of fact must reasonably find that the employer "acted with malice or reckless indifference to [an employee's] Title VII rights." *Id.*

Fleet argues that it should not be liable for punitive damages because it was "not ap-

prised of the alleged sexual harassment until almost two years after its alleged inception in March 1995." Fleet Memo. at 23, n. 14. However, if the jury concludes that Fleet has not met the reasonableness prong of the *Faragher/Ellerth* affirmative defense because it failed to exercise reasonable care in preventing and promptly correcting Title VII violations, the jury could also find that Fleet acted with "reckless indifference" to plaintiff's Title VII rights. Therefore, the Court cannot rule as a matter of law that plaintiff is precluded from seeking punitive damages.

conditions, *id.*, such as termination, demotion, or a reduction in wages or benefits. *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999). "[L]ess flagrant reprisals by employers may [also] be adverse." *Id.* (*quoting Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997)). Because there are no bright-line rules as to which employment actions meet the threshold for "adverse," courts must make this determination on a case-by-case basis. *Richardson*, 180 F.3d at 446.

Courts have held that where an employer deliberately fails to remedy alleged harassment out of retaliation for engaging in protected activity, such failure may be actionable under Title VII when it leads to an adverse employment action, such as a constructive discharge. *See, e.g., Cooper v. Wyeth Ayerst Lederle*, 106 F.Supp.2d 479, 497 (S.D.N.Y.2000); *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir.1997) (holding that an employee could have suffered a retaliatory constructive discharge had her employer not investigated and corrected the pervasive harassment). *But see O'Dell v. Trans World Entertainment Corp.*, No. 00 Civ. 5156(SAS), 2001 WL 726946 (S.D.N.Y. June 28, 2001) ("[F]ailing to take a sexual harassment complaint seriously does not constitute a constructive discharge.").[47] An employee cannot simply assume that her complaint of harassment will not be adequately addressed, however. *Cf. Cooper*, 106 F.Supp.2d at 495 ("An employee who fails to explore alternative avenues offered by her employer before concluding that resignation is the only option cannot make out a claim of constructive discharge.").

Plaintiff identifies the following as the adverse actions she allegedly suffered as a result of Fleet's retaliation: Fleet failed to conduct an impartial investigation of her complaint, knowingly placed her in close physical proximity to the manager who had harassed her which led to her constructive discharge, and represented Coville at the CHRO hearing. For the reasons discussed below, the Court concludes that only plaintiff's allegations of constructive discharge qualify as an adverse employment action within the contemplation of Title VII.

■ First, plaintiff claims that Fleet failed to conduct an impartial investigation of her complaint in December 1996. Even if this is true, however, she has identified no way in which the investigation impacted her working conditions, apart from the attenuated effect that Coville was not disciplined or removed. However, "there is no requirement that the remedy [taken in response to a Title VII complaint] include punishing the co-worker responsible for the sexual harassment.... Title VII simply requires that the remedial action taken be reasonably calculated to end the harassment." *Cooper*, 106 F.Supp.2d at 495. Thus, the continued presence of Coville, and Fleet's failure to transfer her to a position away from his vicinity are more

---

47. The plaintiff in *O'Dell* had claimed that she was constructively discharged when she quit because she believed her employer would not take her complaints of harassment seriously based on the employer's past failure to keep her complaint confidential as promised, the employer's initial refusal to communicate with plaintiff's counsel and the employer's statement to plaintiff that her doctor's note was insufficient to support her claim for med-ical leave. *Id.* Although stating that refusal to take seriously a sexual harassment complaint could not constitute a constructive discharge, the court went on to analyze plaintiff's claims and concluded that in the absence of any evidence that the employer deliberately acted to force plaintiff to resign, the ineffectiveness of the investigation without more did not amount to a constructive discharge. *Id.*

properly considered as part of plaintiff's constructive discharge claim.

Next, as for plaintiff's claim that Fleet retaliated against her by providing Coville with representation at the CHRO hearing, the only reference to this issue in the record is testimony from Mary Long of Fleet Human Resources, stating that Fleet's attorney "told Tom that he would need to get an attorney." [48] Moreover, an employer is entitled to take "reasonable defensive measures" in protecting itself from a sexual harassment complaint. *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997). Thus, assuming *arguendo* that Fleet provided Coville with representation at a CHRO hearing, Fleet was entitled to do so in order to defend itself against plaintiff's complaint.

■■■ Finally, the Court turns to plaintiff's retaliatory constructive discharge claim.[49] "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, *intentionally* creates an intolerable work atmosphere that forces an employee to quit voluntarily." *Chertkova*, 92 F.3d at 89 (citations and internal quotation marks omitted) (emphasis added); *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir.1993) (a constructive discharge claim is established by showing the employer deliberately created intolerable working conditions in an effort to force the employee to resign). To find that an employee was constructively discharged, the trier of fact "must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the

employee's shoes would have felt compelled to resign." *Lopez v. S.B. Thomas*, 831 F.2d 1184, 1188 (2d Cir.1987). Moreover, as one court has noted,

> [T]he only thing an employer must do to defeat a claim of constructive discharge is provide a working environment that is not "intolerable." This, as the Second Circuit has held repeatedly, is a very low threshold. Put conversely, a working environment can be far from perfect and yet will not be held to be intolerable.

*Cooper*, 106 F.Supp.2d at 497.

■■■ Although "the Second Circuit has declined to state whether deliberateness on the part of the employer requires specific intent to force the employee to resign, it has stated that deliberate conduct requires more than mere negligence or ineffectiveness." *Dean v. Westchester Cty. Dist. Atty's Office*, 119 F.Supp.2d 424, 431 (S.D.N.Y.2000) (citing *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir.2000)). Thus, merely "ineffective or even incompetent ... handling of [complaints] ... does not rise to the level of deliberate action required by [Second Circuit] precedent." *Whidbee*, 223 F.3d at 74.

■■■ According to plaintiff, Fleet's failure to properly investigate her complaint and subsequent refusal to transfer her to a position in which she would have no contact with Coville made her working conditions intolerable in violation of Title VII.[50] Plaintiff does not, however, point to any evidence suggesting that Fleet's refusal to

---

**48.** Deposition of Mary Long taken October 26, 2000 (hereinafter "Long Dep. II") at 128.

**49.** Although constructive discharge is not a "tangible employment action" for hostile work environment purposes, it may be an "adverse employment action" giving rise to a Title VII retaliation claim. *See Fitzgerald v.*

*Henderson*, 251 F.3d 345, 357 (2d Cir.2001); *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir.1996).

**50.** Plaintiff does not argue that the threatening encounter with Coville itself constituted retaliatory constructive discharge.

transfer her to a different position was part of a *deliberate* attempt to make her working conditions intolerable.[51]

In response to plaintiff's CHRO complaint, Mary Long and Rosemary Terrassi of Fleet Human Resources conducted an investigation in which they interviewed Coville and eight other current and former employees.[52] Long and Terrassi explained that they did not interview the plaintiff because she was out on medical leave and could be contacted only through her attorney.[53]

On February 5, 1997, Fleet concluded that no sexual harassment had taken place. Nevertheless, Fleet agreed to transfer plaintiff to the Repossession Unit of the Auto Finance Division, outside of Coville's management. The Repossession Unit was on the same floor as the Auto Dialer Unit, and plaintiff's new desk was approximately 75 feet away from Coville's office. Although Fleet claims that plaintiff would have no need to interact with Coville in her new capacity, plaintiff explained in her deposition that just the opposite is true:

> The repossession department work[s] hand in hand with the auto finance department. Like if someone in the auto finance department is collecting on a delinquent account or a car was repoed, then the auto finance department [would] have to come talk to us or we as repo people [would] have to go talk to the auto finance department to see if the

payment was actually made. So, we had to interact regardless.[54]

Fleet further claims that it was unable to accommodate plaintiff's request for a customer service position in another division because of a bank-wide hiring freeze, and because plaintiff was not qualified for any of the available positions.[55]

Plaintiff returned from medical leave on February 11, 1997, and began work in the Repossession Division under the management of Allen Nadeau and supervision of Louanne Demeo.[56] According to plaintiff, Coville confronted her at around noon, as she was heading into the women's restroom, and told her in a threatening manner that, "[y]ou think you're smug, you're not going to get away with anything."[57] Plaintiff states that co-worker Tracy Neal followed her into the restroom and "asked me was I all right and I said yeah."[58] Plaintiff also stated in her deposition that she "was very uncomfortable [and] did not appreciate them putting me in the repossession department when I have to interact with Mr. Coville[,] period."[59] After conferring with her then-attorney Kimberley Graham, plaintiff left work and never returned.[60]

Even if these facts could make out a prima facie case of retaliatory constructive discharge, plaintiff has failed to provide any evidence from which the conclusion could be drawn that Fleet's legitimate non-discriminatory reason offered for the

**51.** Plaintiff's complaint similarly contains no allegation that Fleet deliberately refused to transfer her away from Coville.

**52.** *See* Long Dep. II at 143–44; Deposition of Rosemary Terrassi (hereinafter "Terrassi Dep.") at 84; *see also* Fleet Investigation Notes.

**53.** Long Dep. II at 143–144; Terrassi Dep. at 84.

**54.** Wilburn Dep. I at 157–158.

**55.** Long Dep. II at 144; Terrassi Dep. at 98.

**56.** Wilburn Dep. I at 138.

**57.** Wilburn Dep. I at 153–154.

**58.** *Id.*

**59.** *Id.* at 157.

**60.** *Id.* at 158.

transfer is pretextual and that retaliation against Ms. Wilburn for her CHRO complaint was a motivating factor.

Fleet has offered a legitimate nondiscriminatory reason for its decision to transfer plaintiff to a position permitting continued exposure to Coville: the hiring freeze. The burden therefore shifts to plaintiff to show that Fleet's reason is pretextual and that retaliation was a real reason. *Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir.1998). In response to Fleet's hiring freeze explanation, plaintiff has submitted a copy of a Fleet Human Resources internal memo, dated January 13, 1997, that exempts existing employees who wish to transfer into the Retail and Business Banking Division from the bank-wide hiring freeze. At oral argument, plaintiff's counsel characterized the testimony of Long and Terrassi as stating that the Fleet hiring freeze was company-wide, such that the internal memo of January 13, 1997 directly contradicts their testimony and raises a genuinely disputed factual issue of pretext.

However, the record shows that neither Long nor Terrassi testified that the hiring freeze was company-wide. Long merely stated that there was a hiring freeze, and that plaintiff was not qualified for any open positions.[61] And according to Terrassi, "We were in the middle of a hiring freeze, almost constantly in the middle of a hiring freeze. The Collection area in Auto Finance was desperately in need of experienced help. I do not know of any other place where Gloria could have been placed."[62] More importantly, however, plaintiff has not submitted any evidence

from which a reasonable fact-finder could conclude that she was in fact qualified for any available positions within the division Retail Business and Banking Division. Finally, and equally problematic, is the absence of any evidence in the record suggesting that Fleet's motive in transferring her to a position near Coville was retaliatory.[63]

For the foregoing reasons, Fleet's motion for summary judgment is granted as to plaintiff's retaliation claims (Counts Two and Five).

### D. *Negligent Infliction of Emotional Distress*

Fleet contends that it is entitled to summary judgment on plaintiff's claim for negligent infliction of emotional distress, on the ground that Fleet did not engage in unreasonable conduct in the termination process. Alternatively, Fleet argues that plaintiff cannot establish the required element of unreasonableness.

In support of its argument that only conduct in the termination process can give rise to a claim for negligent infliction of emotional distress, Fleet relies on *Parsons v. United Tech. Corp., Sikorsky Aircraft Div.*, 243 Conn. 66, 88, 700 A.2d 655 (1997), in which the Connecticut Supreme Court held that, "negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process." *Id.* (citations and internal quotation marks omitted). Parsons, however, was a termination case, and the Connecticut Supreme Court did

---

61. Long Dep. at 144.

62. Terrassi Dep. at 98.

63. As noted *supra* note 50, plaintiff does not claim that Coville's acts, which are clearly retaliatory, constituted a constructive dis-

charge for which Fleet should be held liable. Instead, as she limits her argument to Fleet's alleged failure to protect her from Coville, she must at a minimum identify some evidence creating a disputed issue of fact as to whether this failure was retaliatory.

not discuss whether negligent infliction of emotional distress was actionable outside the termination context.

■ In *Malik v. Carrier Corp.*, 202 F.3d 97, 103 (2d Cir.2000), the Second Circuit considered *Parsons* and held that claims for negligent infliction of emotional distress brought under Connecticut law are *not* limited to unreasonable conduct in the termination process. This holding was based in part on dicta in *Parsons* that stated that "few courts have addressed the requirements of a claim for [emotional distress] within the employment relationship as a whole, much less in the context of the termination of such a relationship." *Id.* (*quoting Parsons*, 243 Conn. at 89, 700 A.2d 655); *accord Karanda v. Pratt & Whitney Aircraft*, No. CV–98–582025S, 1999 WL 329703, at *5 (Conn.Super.Ct. May 10, 1999) (holding that the Connecticut Supreme Court "would permit a negligent infliction of emotional distress claim against an employer when no termination is alleged.").[64] Fleet's argument that the negligent infliction of emotional distress claim must pertain to the termination process thus fails under *Malik*.

■ Fleet also contends that it is entitled to summary judgment on the negligent infliction of emotional distress claim

because as a matter of law plaintiff cannot establish that its conduct was unreasonable. Under Connecticut law, plaintiff has the burden of proving that the defendant knew or should have known that its conduct carried an "unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." *Parsons*, 243 Conn. at 88, 700 A.2d 655 (citations and internal quotation marks omitted).

■ Fleet's motion for summary judgment as to this claim rests almost entirely[65] on its contention that "Fleet has established the *Faragher/Ellerth* defense to the Title VII claims, and, accordingly, the conduct that forms the basis of the Title VII claims cannot also form the basis of a viable negligent infliction of emotional distress claim."[66] Fleet does not, however, cite any cases in support of its contention that the Title VII affirmative defense is also a defense to a common law negligent infliction claim based on respondeat superior. The Court need not decide this now, however, because Fleet is not entitled to summary judgment on plaintiff's the sexual harassment claims because it has not satisfied the "reasonableness" prong of the *Faragher/Ellerth* affirmative defense.

---

**64.** *But see, e.g., Luedee v. Strouse Adler Co.*, No. CV–97–0257057, 1998 WL 46628, at *4, 1998 Conn.Super. LEXIS 250, at *16–17 (Conn.Super.Ct. Jan.29, 1998) (negligent infliction of emotional distress claim brought in the employment context only arises where employer was unreasonable in the termination process).

**65.** In its reply brief, Fleet argues belatedly that plaintiff has not set forth specific facts showing that there is a genuine issue for trial on her claim of negligent infliction of emotional distress. Fleet Reply Memo. at 11. However, Fleet does not expand on this contention, and merely states that, "Plaintiff has failed to show that any emotional distress she allegedly suffered took place in the termi-

nation process and that it was severe." *Id.* at 12. However, plaintiff's evidence on summary judgment included a medical report and testimony stating that she suffers from severe depression caused by Coville's sexual harassment. *See* Plaintiff's Expert Report; Wilburn Dep. 60–64. Thus, the Court finds that plaintiff has set forth sufficient evidence of emotional distress to permit a reasonable factfinder to conclude that her distress was severe. As already noted, the Second Circuit's holding in *Malik* precludes the conclusion that the distress plaintiff suffered must be in the termination process.

**66.** Fleet Memo. at 30.

### E. *Invasion of Privacy*

■ Fleet argues that it is entitled to summary judgment on the invasion of privacy claim because it has satisfied the *Faragher/Ellerth* affirmative defense. Again, apart from whether this indeed constitutes an affirmative defense to a common law tort, this argument is unpersuasive because Fleet has not satisfied beyond dispute the first prong of *Faragher/Ellerth*.

■ Under Connecticut law, an invasion of privacy claim may lie where, *inter alia,* the defendant has "unreasonabl[y] intru[ded] upon the seclusion of another[.]" *Gallagher v. Rapoport,* No. CV 960149891S, 1997 WL 240907 at * 1, 1997 Conn.Super. LEXIS 1190 at *4 (1997 Conn.Super. Ct. May 6, 1997); *accord Goodrich v. Waterbury Republican–American, Inc.,* 188 Conn. 107, 128, 448 A.2d 1317 (1982). In *Rapoport,* evidence that the defendants had impermissibly groped the plaintiff was sufficient to show an unreasonable invasion of privacy. *Rapoport,* 1997 WL 240907 at *1, 1997 Conn.Super. LEXIS 1190 at *7. Connecticut courts have also held an employer liable for invasion of privacy where sexual harassment was committed by one of its supervisors. *Barnett v. Woods,* No. CV 000371822, 2000 WL 1196354 at *1, 2000 Conn.Super. LEXIS 1976 at *6 (Conn.Super.Ct. July 28, 2000).

Because Fleet has not established as a matter of law that it exercised reasonable care, the sole basis on which it moves for summary judgment on the invasion of privacy claim, summary judgment is denied as to Count Nine.

### F. *Negligent Supervision*

■ Fleet seeks summary judgment on the negligent supervision claim based on its belief that it has established reasonableness under the *Faragher/Ellerth* affirmative defense, and because Fleet neither knew nor had reason to know that Coville had a propensity for sexual harassment.

Fleet argues, citing *Karanda,* 1999 WL 329703 at *10, 1999 Conn. Super LEXIS 1587 at *28, that "a defendant does not owe a duty of care to a plaintiff to protect her from another employee's actions *unless the defendant knows or has reason to know that the employee has a propensity to engage in tortious conduct." Id.* at *10, 1999 Conn. Super LEXIS 1587 at *28 (emphasis added). Plaintiff responds with a conclusory allegation that "Fleet turned a blind eye to Defendant Coville's bad acts and his propensity to engage in such acts." However, plaintiff fails to cite any evidence that would permit a jury to find that Fleet knew of Coville's propensity to engage in sexually harassing conduct prior to the filing of her CHRO complaint. Plaintiff's own reporting of the alleged harassment— the only evidence in the record suggesting knowledge by Fleet of Coville's alleged propensity—cannot establish that Fleet had reason to know of his propensity prior to that conduct.

Accordingly, Fleet's motion for summary judgment is granted as to plaintiff's claim of negligent supervision (Count Ten).

### III. Conclusion

■ For the reasons set forth above, Fleet's partial [67] motion for summary judg-

---

67. Although Fleet also argues that summary judgment should be granted on plaintiff's intentional infliction of emotional distress claim (Count Six) because Coville's conduct was not outrageous, this argument was raised for the first time in Fleet's reply brief, and the Court therefore has not considered it. *See* D. Conn. L. Civ. R. 9(g) (reply briefs "must be strictly confined to a discussion of matters raised by the responsive brief"); *see also United States*

ment [Doc. # 46] is GRANTED IN PART and DENIED IN PART. Summary judgment is GRANTED as to Counts Two and Five (Retaliation) and Count Ten (Negligent Supervision). Summary judgment is DENIED as to Counts One and Four (Sexual Harassment); Count Eight (Negligent Infliction of Emotional Distress); and Count Nine (Invasion of Privacy). Fleet's supplemental motion for summary judgment [Doc. # 68] is DENIED.

IT IS SO ORDERED.

v. *Gigante*, 39 F.3d 42, 50 n. 2 (2d Cir.1994) (court will not consider arguments made for the first time in reply brief); *United States v. Letscher*, 83 F.Supp.2d 367, 377 (S.D.N.Y. 1999) (same); *Chase Manhattan Bank v. T & N PLC*, 905 F.Supp. 107, 122, n. 5 (S.D.N.Y. 1995) (same).